637 A.2d 1223

**Edward F. SHEPTER, Jr. et al.**

v.

**JOHNS HOPKINS UNIVERSITY.**

**No. 63, Sept. Term, 1993.**

Court of Appeals of Maryland.

March 11, 1994.

Nevett Steele, Jr. (Michael J. Gentile, Carolyn W. Stamp, Nevett Steele, Jr., P.A., all on brief), Baltimore, for appellants.

Shale D. Stiller (Evelyn W. Pasquier, Piper & Marbury, all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and RODOWSKY, McAULIFFE,* CHASANOW, KARWACKI, and ROBERT M. BELL, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

RODOWSKY, Judge.

This case concerns the Maryland Uniform Estate Tax Apportionment Act, Maryland Code (1988, 1993 Cum.Supp.), § 7–308 of the Tax General Article (TG). We granted certiorari on our own motion to decide whether TG § 7–308 confers exclusive jurisdiction on the orphans' courts over estate tax apportionment liability determinations. 331 Md. 284, 627 A.2d 1063. As we explain below, TG § 7–308 is an application to liability for the payment of estate taxes of the equitable doctrine of contribution. Consequently, we hold that there is concurrent subject matter jurisdiction between the circuit courts and the orphans' courts over claims for apportionment of estate taxes.

The subject claim for apportionment was asserted in a circuit court by the appellee, Johns Hopkins University (JHU), against the appellants. JHU is the trustee and the

---

* McAULIFFE, J. now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

owner of the remainder interest under an inter vivos trust created in 1983 by Edward F. Shepter (Edward) and Elsie R. Shepter (Elsie), husband and wife. The trust provides for fixed, annuity payments totaling $100,000 per year. Appellants (the Shepters) are children, spouses of children, and certain grandchildren of Edward and Elsie. Edward, Elsie, and the Shepters had and have lifetime interests in the annuity. Elsie survived Edward and died in 1986. The annuity was valued in her federal estate tax estate, resulting in estate taxes that were many times the total value of her probate estate. Those federal taxes, with interest, were collected from JHU by the Internal Revenue Service (IRS). In this action JHU seeks to minimize its losses by claims against the Shepters. Those claims include apportionment under TG § 7–308 to certain jointly held bank accounts and to Elsie's gift of her home during her lifetime.

More specifically, the facts are these. Edward was a retired certified public accountant. He and Elsie were residents of Baltimore County. In November 1982, when Edward was age seventy-six and Elsie was age seventy-eight, Edward telephoned the JHU Institutions Development Office. That contact ultimately resulted in the preparation for, and execution by, Edward, Elsie and JHU of a "Charitable Remainder Annuity Trust," dated December 1, 1983. The trust was funded by securities transferred by the donors that were valued at $1,281,330.85. Initial beneficiaries of the trust were Edward and Elsie. During their joint lifetimes JHU undertook to "pay to them jointly an annuity amount of $100,000 in each calendar year of the trust...." "The annuity amount shall be paid in equal monthly installments from income and, to the extent that income is not sufficient, from principal or other assets of Hopkins." Upon the death of either Edward or Elsie, JHU would pay the survivor "an annuity amount of $100,000 in each calendar year...." Upon the death of the survivor, the trust assets were to be divided into four equal shares, one for the benefit of each of the four children of Edward and Elsie and, as to the three married children, their named spouses as well. Each child would receive an annuity

amount of $25,000 "payable from income and, to the extent income is insufficient, from principal or other assets of Hopkins." The $25,000 shares of the annual annuity of two of the married children were to be paid, respectively, to a named grandchild of Edward and Elsie upon the death of the surviving parent of that grandchild. Upon the death of the last surviving person for whose benefit a trust share was held, the share was to be "irrevocably transferred outright and free from trust to [JHU] to be used for its general purposes." The instrument declared the intention of the donors and of JHU "to create a charitable remainder annuity trust within the meaning of Section 664 of the" Internal Revenue Code (IRC).

JHU paid, and continues to pay, annuities as provided in the trust.

Edward died in March 1985. In November 1985, Elsie executed a power of attorney appointing a daughter, Ann C. Shepter (Ann), as attorney-in-fact. Elsie, acting through her attorney-in-fact, in January 1986 conveyed her home to a son, George R. Shepter (George), for no consideration. Elsie's 1986 federal gift tax return valued that gift at $153,000. When Elsie's federal estate tax was ultimately resolved, the $153,000 gift to George was included as an "adjusted taxable gift." IRC § 2001(b)(1)(B).

At Elsie's death she owned, jointly with Ann, two bank accounts totaling $17,770.36. When Elsie's federal estate tax was ultimately resolved, the value of those joint accounts was included in Elsie's "taxable estate." IRC § 2001(b)(1)(A).

Elsie died in November 1986. Administration of her probate estate was undertaken before the Orphans' Court for Baltimore County. Her original federal estate tax return, filed by Ann as her personal representative, was prepared by Elsie's former personal attorney. It reported as due a federal estate tax of $320,094. Elsie's inventoried probate estate totaled less than $22,000. The federal estate tax was not paid with the return. In April 1990, the IRS served a notice on Elsie's estate claiming tax, late payment penalty, and interest amounting to nearly $458,000.

It was the JHU annuity, passing to Elsie's children on her death, that made Elsie's estate taxable under the federal estate tax. On the estate's federal return, as originally filed, that annuity was valued at $1,000,000 by capitalizing it at ten percent, apparently as required by IRS regulations. Ultimately the IRS turned its collection efforts in JHU's direction, in reliance on IRC § 6324(a)(2) which provides in relevant part:

> "If the estate tax ... is not paid when due, then the spouse, transferee, trustee ... or beneficiary, who receives ... property included in the gross estate ... to the extent of the value, at the time of the decedent's death, of such property, shall be personally liable for such tax."

JHU submitted an offer in compromise to the IRS. In January 1992, JHU paid the IRS federal estate taxes of $226,072 and interest of $139,128, thereby settling all IRS claims against any and all persons for estate taxes, interest, and penalty arising out of Elsie's estate.

JHU filed its complaint against the Shepters in the Circuit Court for Baltimore City in October 1990. The Shepters made no threshold objections to jurisdiction or venue. After certain defense motions, now irrelevant, were overruled, the Shepters answered on the merits and filed a counterclaim and third-party complaint.[1] The Shepters claim that JHU owed a duty to them that was breached because the trust was subjected to significant tax assessments.

JHU moved to dismiss the Shepters' counterclaim. As plaintiff, JHU also sought partial summary judgment against George for the portion of the estate tax and interest attributable to the gift to him of the house, and sought partial

---

1. The third-party claim impleaded three individuals associated with JHU development activities. There is no distinction, material to the issues on this appeal, between JHU and those three individual defendants. Thus, for purposes of brevity, we shall refer only to the counterclaim in describing the claims asserted by the Shepters.

The Shepters' third-party complaint also joined the attorney who prepared the charitable remainder annuity trust and that attorney's law firm. Those parties are not parties to this appeal.

summary judgment against Ann for the portion of the estate tax and interest attributable to the transfer to her by survivorship of the monies in the joint bank accounts. Among the arguments raised by the Shepters in opposing those motions was the contention that exclusive subject matter jurisdiction over apportionment was vested by TG § 7–308 in the orphans' courts.

The Circuit Court for Baltimore City overruled the jurisdictional objection. We shall consider the jurisdictional issue in Part I of this opinion. JHU's motion to dismiss the Shepters' counterclaim was granted, and the circuit court entered that judgment as final under Maryland Rule 2–602. We consider the Shepters' appeal from that judgment in Part II of this opinion. The circuit court also granted JHU's motions for summary judgment against Ann and George, and certified those judgments as final. The merits of the partial summary judgments are the subject of Part III.

## I

TG § 7–308 states the rule that "[t]he tax shall be apportioned among all persons interested in the estate." § 7–308(b). In § 7–308, " '[t]ax' means the federal estate tax and the Maryland estate tax and interest and penalties imposed in addition to the taxes." § 7–308(a)(5). " 'Person interested in the estate' means any person who is entitled to receive or has received, from a decedent while alive or by reason of the death of a decedent, any property or interest in property included in the taxable estate of the decedent." § 7–308(a)(4). Employing the values used to determine the tax, apportionment is made "in the proportion that the value of the interest of each person interested in the estate bears to the total value of the interests of all persons interested in the estate." § 7–308(b).[2]

---

2. TG § 7–308(k) provides that these statutory rules may be altered by will or other controlling instrument. Here, Elsie's will directed that estate taxes be paid out of the residue. JHU takes the position that where, as here, the estate taxes were not, and could not be, paid out of the probate estate, such a provision of a will is ineffective to alter the

The Shepters' jurisdictional argument relies specifically on § 7–308(c)(1) and TG § 7–101(b). The former reads:

> "The court shall determine the apportionment of the tax. If there are no administration proceedings, the court of the county where the decedent was domiciled at death shall determine the apportionment of the tax on the application of the person required to pay the tax."

"Court" is not defined in § 7–308. TG § 7–101(a), however, provides that in Title 7, "Death Taxes," of the Tax–General Article, the "following words have the meanings indicated." The first of the following words is "Court." Per TG § 7–101(b),

> " '[c]ourt' means:

> "(1) The Orphans' Court of a county;  or

> "(2) A court of the State that exercises the jurisdiction of an Orphans' Court."

The Shepters' argument also recognizes TG § 7–308(c)(5), which reads:

> "In any suit or judicial proceeding to recover from any person interested in the estate the amount of the tax apportioned to the person in accordance with this section, the determination of the court is prima facie correct."

Thus, the Shepters submit that an orphans' court must make the initial determination of whether there is liability on the part of an interested person for apportionment of estate tax and, if so, the initial determination of the amount of that liability. Under the Shepters' construction § 7–308(c)(5) deals only with collection of the amount of tax apportioned by an orphans' court to an interested person in the event suit is necessary to collect. For example, where a personal representative has paid the tax but does not hold property, distributable to an interested person who is liable for apportionment, from which the apportionment might be collected under TG

---

operation of the rule of law.  That aspect of JHU's legal position is not questioned on this appeal.

§ 7–308(d)(1), it might be necessary for the personal representative to sue in a circuit court in order to collect.

Reinforcing their construction, the Shepters point to TG § 7–308(i) which states that "[t]he provisions of [§ 7–308] that are uniform with statutes enacted in other states shall be construed to make uniform the laws of those states that enact the uniform provisions." The Court of Appeals of Michigan in *Detroit Bank & Trust Co. v. Grunewald*, 26 Mich.App. 495, 182 N.W.2d 628 (1970), construed the Michigan version of the Uniform Estate Tax Apportionment Act to confer exclusive jurisdiction on the probate courts of that state.

JHU, on the other hand, primarily points to the history of apportionment legislation in Maryland. JHU notes that earlier apportionment legislation expressly vested exclusive jurisdiction in the circuit courts, whereas the current statutes do not in terms make jurisdiction exclusive in the orphans' courts. The result, JHU submits, is concurrent jurisdiction.

Maryland's first estate tax apportionment statute, enacted by Chapter 546 of the Acts of 1937, made no reference to any court. The 1937 act was repealed, and a new statute was enacted, by Chapter 156 of the Acts of 1947. The 1947 legislation, codified as Md.Code (1939, 1947 Cum.Supp.), Art. 81, § 126, provided in subsection (8) that "[t]he courts of equity of this State shall have exclusive jurisdiction of all actions under this section to enforce contribution or apportionment with respect to estate taxes." In 1965, by Chapter 907 of the Acts of that year, the General Assembly repealed the 1947 enactment and adopted, with modifications, the 1964 revised version of the Uniform Estate Tax Apportionment Act (the Uniform Act). *See* 8A Uniform Laws Annotated 331 *et seq.* (1993). As codified in Md.Code (1957, 1965 Repl.Vol.), Art. 81, § 162, the 1965 enactment provided in § 162(3)(a) as follows:

"The orphans' court having jurisdiction over the administration of the estate of a decedent shall determine the apportionment of the tax. If there are no administration proceedings, the orphans' court of the county (or the City of

Baltimore), wherein the decedent was domiciled at death shall determine the apportionment of the tax upon the application of the person required to pay the tax."

Section 162(3)(e) of the 1965 statute, from which TG § 7–308(c)(5) is derived, provided that "[i]n any suit or judicial proceeding to recover ... the amount of the tax apportioned ... the determination of the orphans' court in respect thereto is prima facie correct."

The Maryland Uniform Estate Tax Apportionment Act was moved at the recommendation of the Henderson Commission from § 162 of Art. 81 to revised Art. 93, "Decedents' Estates." *See* Second Report of the Governor's Commission to Review and Revise the Testamentary Law of Maryland 155–59 (1968); Chapter 3 of the Acts of 1969; Md.Code (1957, 1969 Repl. Vol.), Art. 93, § 11–109.

The comment by the Henderson Commission to former Art. 93, § 11–109 is that the statute was removed *"verbatim"* from Art. 81. *See* Report of the Governor's Commission, *supra,* at 159; comment following former Art. 93, § 11–109. Actually, former Art. 81, § 162(3)(a) was modified by deleting the words appearing in brackets, as follows: "The [orphans'] court [having jurisdiction over the administration of the estate of a decedent] shall determine the apportionment of the tax." It is clear that "orphans'" was deleted when enacting § 11–109(c)(1) because § 2–101 of the revised Decedents' Estates Article created the same definition of "court," throughout that article, as is currently found in TG § 7–101(b). Further, we infer that the deletion of the words, "having jurisdiction over the administration of the estate of a decedent," was intended only to eliminate apparently unnecessary verbiage, and not to effect a change of substance. The immediately following sentence addresses apportionment by an orphans' court "[i]f there are no administration proceedings," and, implicitly, the first sentence addresses apportionment by an orphans' court when there are administration proceedings. The question here is whether those two sentences exhaust the universe of court ordered apportionment.

With the enactment of the Estates and Trusts Article as part of the Code Revision Project, former Art. 93, § 11–109 was enacted by Chapter 11 of the Acts of 1974 as Md.Code (1974), § 11–109 of the Estates & Trusts Article. No changes were made except in style. *See* Revisor's Note following § 11–109. Former § 11–109 of the Estates and Trusts Article was transferred by Chapter 2 of the Acts of 1988 to TG § 7–308, without change to any portion of the statute relevant to the jurisdictional issue before us. *See* Revisor's Note following TG § 7–308.

Thus, our inquiry focuses on the legislative intent in 1965 when the General Assembly deleted the statement that "[t]he courts of equity of this State shall have exclusive jurisdiction of all actions under this section to enforce contribution or apportionment with respect to estate taxes," and adopted language reading, "the Orphans' Court having jurisdiction over the administration of the estate of a decedent shall determine the apportionment of the tax." For the reasons that follow we hold that the change was not intended to oust the circuit courts of historic equity jurisdiction, and that the purpose of the change was to cure any possible lack of orphans' court jurisdiction. The result is concurrent jurisdiction between the two types of courts.

## A

■ Long before the federal estate tax was enacted in 1916, 39 Stat. 756, ch. 463, courts exercising general equity jurisdiction were determining and enforcing contribution among joint debtors. In 2 Pomeroy, *Equity Jurisprudence* § 407 (5th ed. 1941), the author observes that equity

"will apply the maxim ['equality is equity'] either directly, by apportioning the burden *ratably* among all the individuals upon whom the common liability rests, or indirectly, by giving a right of *contribution* to the member of the class from whom a payment of the whole demand has been obtained, and enabling him to recover contributory shares of the amount from the other members of the class, by which

means the entire burden is finally adjusted upon and among them all."

*See also* H. McClintock, *Principles of Equity* § 204 (2d ed. 1948); R.E. Megary & P.V. Baker, *Snell's Principles of Equity* 456 (27th ed. 1973); H. Ginsburg, *Equity Jurisprudence and Procedure in Maryland* 124 (1928).

Contribution between joint obligors is part of the common law of this State. *See Jackson v. Cupples,* 239 Md. 637, 212 A.2d 273 (1965) (contribution between co-endorsers); *Sheeler v. Holt,* 161 Md. 366, 157 A. 195 (1931) (co-endorsers); *Hogan v. McMahon,* 115 Md. 195, 80 A. 695 (1911) (contribution between tenants in common for liens and encumbrances paid by one); *Hooper v. Hooper,* 81 Md. 155, 31 A. 508 (1895) (co-guarantors of principal debtor's account with creditor); *Young v. Lyons,* 8 Gill 162 (1849) (co-sureties); *Craig v. Ankeney,* 4 Gill 225 (1846) (co-sureties, by separate writings, of the same debt).

Recently we applied equitable contribution on behalf of a person who had paid a joint tax obligation. For failing to withhold income taxes, the Maryland income tax statutes impose personal liability on any corporate officer who exercises direct control over a corporate taxpayer's fiscal management. *See* TG § 10–906(d). *Lyon v. Campbell,* 324 Md. 178, 596 A.2d 1012 (1991), involved a bankrupt corporation which, prior to bankruptcy, had failed to pay over to the Comptroller $415,000 in withholding taxes. The plaintiff and the defendant were the sole shareholders of the bankrupt and allegedly exercised direct control over its fiscal affairs. The plaintiff paid $150,000 to the Comptroller in full satisfaction of tax liens filed by the Comptroller, and then the plaintiff sought contribution from the defendant. *Id.* at 180, 596 A.2d at 1013. No statute recognized contribution under the circumstances presented in *Lyon.* Nevertheless, applying principles that originated in equity, we held that the plaintiff was "entitled to contribution of [the defendant's] pro rata share of the amount [the plaintiff] paid to satisfy their joint obligation." *Id.* at 184, 596 A.2d at 1015.

Courts in other states have recognized that apportionment of estate taxes is an application of equitable contribution. Those courts either apply the equitable doctrine to effect apportionment in the absence of a statute, or identify the equitable doctrine as the principle underlying an apportionment statute. Illustrative is *Wilmington Trust Co. v. Copeland,* 33 Del.Ch. 399, 94 A.2d 703 (1953), which arose out of the following background.

Prior to 1942 two lines of decisions had developed on whether federal estate taxes could be apportioned in the absence of a statute or direction in the instrument. *See* W. Sutter, *Apportionment of the Federal Estate Tax in the Absence of Statute or an Expression of Intention,* 51 Mich. L.Rev. 53 (1952). One line of cases, reasoning from the language of the federal estate tax statutes, concluded that federal estate tax liability fell exclusively on the residuary estate. *Id.* at 54–58. The other line of cases, relying on equitable principles, permitted apportionment. *Id.* at 58. When New York adopted an apportionment statute, its constitutionality was challenged under the supremacy clause. *Riggs v. Del Drago,* 317 U.S. 95, 63 S.Ct. 109, 87 L.Ed. 106 (1942), held that the federal estate tax statutes did not preclude apportionment under state law. In 1947 Delaware enacted an apportionment statute patterned on the New York statute, and, in *Equitable Trust Co. v. Richards,* 31 Del.Ch. 564, 73 A.2d 437 (1950), application of the new statute to estates of decedents dying before its enactment was held to be unconstitutional. The *Richards* decision reasoned that the apportionment act effected a change in the law by imposing a liability which previously did not exist.

*Wilmington Trust Co. v. Copeland,* an appeal from an orphans' court order denying apportionment in reliance on *Richards,* reexamined that holding and overruled it. 94 A.2d at 710. The *Wilmington Trust* court said that the rule of law embodied in the statute "is nothing more than the doctrine of equitable contribution ...," *id.* at 708, and that "it makes no difference to equity that the common charge is that of a tax

lien imposed by the federal government," *id.* at 709. With respect to the purpose of the Delaware statute, the court said:

> "The apportionment act did not change the law; it declared as law a principle theretofore firmly embedded in our jurisprudence. In so doing, the General Assembly may have been moved to resolve the doubt created by the opinion of many members of the bar that the rule of the earlier state decisions was the law of Delaware; perhaps the legislative intent was merely to provide a simple formula for apportionment and an expeditious remedy. Whatever the reason, it is clear to us that the effect of the statute is to declare the law as it existed, provide such a formula, and confer ample equitable jurisdiction upon the Orphans' Court to administer the statute. That concurrent jurisdiction exists in the Court of Chancery is no bar to the legislative will."

*Id.*

For other decisions expressly recognizing that the apportionment of estate taxes is an application of equitable contribution, see *Pearcy v. Citizens Bank & Trust Co.,* 121 Ind.App. 136, 96 N.E.2d 918 (1951); *Succession of Ratcliff,* 212 La. 563, 33 So.2d 114 (1947); *Bragdon v. Worthley,* 155 Me. 284, 153 A.2d 627 (1959); *In re Mellon's Estate,* 347 Pa. 520, 32 A.2d 749 (1943); *In re Jones' Estate,* 54 Pa.D. & C. 364 (Orphans' Ct., Montgomery Co., 1945); and *United States v. Goodson,* 253 F.2d 900, 906 (8th Cir.1958) (dicta). For cases apportioning estate taxes without any statutory foundation for apportionment, see *Regents of Univ. Sys. of Georgia v. Trust Co. of Georgia,* 194 Ga. 255, 21 S.E.2d 691 (1942); *McDougall v. Central Nat'l Bank of Cleveland,* 157 Ohio St. 45, 104 N.E.2d 441 (1952); and *Industrial Trust Co. v. Budlong,* 77 R.I. 428, 76 A.2d 600 (1950).

Further, "it is well settled that the jurisdiction of equity is not ousted by a statute which gives a court of law power over the same subject." *Schroeder v. Loeber,* 75 Md. 195, 204, 24 A. 226, 227 (1892). *See also Barnes v. Crain,* 8 Gill 391 (1849), *aff'g Crain v. Barnes,* 1 Johnson's Ch. 151 (1847). Other

decisions that have applied this rule of construction of jurisdictional statutes include: *United States v. Bank of New York & Trust Co.*, 296 U.S. 463, 479, 56 S.Ct. 343, 348, 80 L.Ed. 331, 339 (1936) ("It is a general rule that the grant of jurisdiction to one court does not, of itself, imply that the jurisdiction is to be exclusive."); *Gurr v. Willcutt*, 146 Ariz. 575, 707 P.2d 979, 983 (Ariz.Ct.App.1985) (" '[T]he presumption is in favor of retention rather than divestiture of jurisdiction.' "); *Shoemaker v. Brown*, 10 Kan. 383, 391 (1872) ("The mere giving of jurisdiction to one court does not show that it must be exercised exclusively by that court."); *Chitty v. Gillett*, 46 Okla. 724, 148 P. 1048, 1050 (1915) ("We do not think the giving of jurisdiction to one court shows that it must be exercised under all circumstances exclusively by that court."); *Lubecki v. Ashcroft*, 557 A.2d 1208, 1213 (R.I.1989) ("Unless the Legislature confers upon a new tribunal 'exclusive original jurisdiction' over matters that had been within the authority of another tribunal, the authority so conferred is concurrent with that of the original tribunal."); *Dimmitt v. City Court of Salt Lake City*, 21 Utah 2d 257, 444 P.2d 461, 463 (1968) ("Where a court is given and would normally have jurisdiction as does the city court ... there would have to be a clear and unequivocal declaration of legislative intent to deprive that court of jurisdiction and confer exclusive jurisdiction on the juvenile court.").

In the instant matter TG § 7–308(c) does not expressly make exclusive the orphans' courts' exercise of jurisdiction in apportionment matters. That omission has added significance when compared to other enactments in which conferrals of jurisdiction were made expressly exclusive, when that was the legislative intent. *See, e.g.,* Chapter 969 of the Acts of 1943, 1943 Md.Laws at 1666, relating to the "exclusive original" jurisdiction in certain civil cases of the former People's Court of Baltimore City; Chapter 616 of the Acts of 1961, 1961 Md.Laws at 952, relating to the "original and exclusive" jurisdiction of the former Municipal Court of Baltimore City to try certain criminal offenses; and Chapter 528 of the Acts of 1970, 1970 Md.Laws at 1259, relating to the "exclusive origi-

nal" jurisdiction of the District Court of Maryland in certain civil actions.

Consequently, the 1947 Maryland enactment, providing that "[t]he courts of equity shall have exclusive jurisdiction of all actions under this section to enforce contribution or apportionment" of federal estate taxes, did not confer jurisdiction on the circuit court, but the enactment limited jurisdiction to the circuit courts. Further, under the ordinary rule of statutory construction the 1965 Maryland enactment, providing that "[t]he orphans' court having jurisdiction over the administration of the estate of a decedent shall determine the apportionment of the tax," did not oust the circuit courts of their preexisting jurisdiction, but the enactment enlarged the jurisdiction of the orphans' courts.

## B

The legislative history of the Maryland Uniform Estate Tax Apportionment Act supports the analysis set forth above. TG § 7–308(c)(1) through (5) are subsections (a) through (e) of § 3 of the 1964 Uniform Act. 8A U.L.A. 338. The first sentence of § 3(a) of the 1964 Uniform Act reads: "The [Probate Court] having jurisdiction over the administration of the estate of a decedent shall determine the apportionment of the tax." It appears that this and other provisions of § 3 were included in the Uniform Act because apportionment of estate taxes may be based on non-probate, as well as probate, assets. The concern was that, constitutionally, a probate court could not even be empowered to adjudicate the liability of a person whose only connection with the orphans' court proceedings was as a transferee of non-probate assets of the decedent.

The comment following § 3 of the Uniform Act by the committee which acted for the National Conference of Commissioners on Uniform State Laws advises in relevant part as follows:

"In the original draft of the Act this section was Section 4 entitled 'Procedure for Determining Tax' which provided

that the Probate Court of the county in which the decedent was domiciled would have jurisdiction to hear and determine the apportionment. At the Boston meeting in 1953 the Conference directed that the section be eliminated in its entirety because it was thought that in instances where the beneficiary was not before or subject to the jurisdiction of the Orphans Court, for example, in suits for apportionment relating to transfers inter vivos, the Probate Court could not constitutionally bind the beneficiary. It was thought that the then preceding Section 3, entitled 'Determination of Proration' providing for suits for recovery of the apportioned tax was sufficient. After consideration the Section of Taxation, A.B.A., and the members of the Committee who have expressed an opinion believe that the Probate Court should determine the apportionment as a part of the administration procedure.... In order to meet the constitutional objection as above stated, the section provides that the determination of the Probate Court shall be prima facie only in any suit to recover the apportioned tax."

8A U.L.A. at 338. The Commissioners would not have intended exclusive jurisdiction in a court which might not be able constitutionally to exercise that jurisdiction in all cases.

Achieving enactment of the Uniform Act in Maryland was a project of the Committee on Probate and Estate Law of the Maryland State Bar Association. That committee, both orally and in writing, reported extensively on the Uniform Act to the 1965 mid-winter and annual meetings of that association. *See* 70 Transactions, Maryland State Bar Association, at 65–66, 143, 394–95, 399 (1965). Those reports do not even hint that an effect of the Uniform Act would be to deprive circuit courts of all jurisdiction to apportion.

## C

The construction of TG § 7–308(c) advanced by the Shepters is also inconsistent with generally accepted concepts of efficient judicial administration. We assume that in many federal estate tax estates the personal representative pays the

total tax and sets off the apportioned tax against the distribution to the legatees. In those cases it is more efficient to determine apportionment in the orphans' court where the estate is administered. But, under the Shepters' construction, whereby the orphans' courts would have exclusive, or at least primary, jurisdiction over the determination of apportionment liability, an orphans' court must initially make that determination even if the person liable for contribution is not a distributee of any part of the probate estate and even if, as here, the party paying the tax and seeking contribution is neither the personal representative nor a distributee of the probate estate. In that situation, without voluntary payment by a transferee liable for apportioned tax, a collection action would have to be brought in a circuit court or in the District Court by the person paying the tax. In that action "the determination of the [orphans' court] is prima facie correct," and thus may be relitigated. TG § 7–308(c)(5). Absent express language limiting jurisdiction to the orphans' courts, we do not construe TG § 7–308 to prevent initial resort in a particular case to a more efficient forum than an orphans' court.

### D

The Shepters' position is supported by *Detroit Bank & Trust Co. v. Grunewald,* 26 Mich.App. 495, 182 N.W.2d 628 (1970). There an individual had created an irrevocable, inter vivos trust and left a will under which the same bank was respectively trustee and executor. The trust provided that it would contribute pro rata to estate taxes, but the will provided that estate taxes should be paid from the residue, without apportionment. The bank's petition to a circuit court for construction of the will and instructions as trustee was dismissed on the ground that the probate court had exclusive jurisdiction. That dismissal was affirmed by the Michigan intermediate appellate court for reasons that we do not find to be persuasive.

In 1963, Michigan had adopted the 1958 version of the Uniform Act. 8A U.L.A. 349. The first sentence of M.C.L.A. § 720.13(a), tracking the first sentence of § 3(a) of the Uni-

form Act, provided, as does TG § 7–308(c)(1), that "[t]he probate court ... shall determine the apportionment of the tax." Relying on that language, the Michigan court said that "it is clear that the legislature intended to repose in the probate court exclusive jurisdiction to decide the apportionment of estate taxes." 182 N.W.2d at 630. The court did not consider the legal history of equitable contribution or the legislative history of the uniform statute. For the reasons explained in subparts I.A., I.B., and I.C. above, we construe "shall" in TG § 7–308(c)(1) to place a duty on an orphans' court to determine apportionment when the jurisdiction of an orphans' court is invoked for that purpose.

The Michigan court also relied on M.C.L.A. § 720.12 which, comparably to TG § 7–308(b) and (k), provided that "[u]nless the will otherwise provides, the tax shall be apportioned among all persons interested in the estate." The court read this provision to permit alteration or omission of apportionment "by *will* only." 182 N.W.2d at 630. From this the court concluded: "It follows that the Legislature has given probate courts exclusive jurisdiction in the area because apportionment depends upon the admission of the will to probate—a matter uniquely within the province of probate courts." *Id.* Under this reasoning, which we reject, a Maryland circuit court would not have jurisdiction to try an action for breach of a contract to make a will in a case in which the probated will would have to be introduced into evidence in order to demonstrate that the contract had been breached.

In any event, decisions under the Uniform Act are not uniform. In 1959, Wyoming adopted the 1958 Uniform Act. 8A U.L.A. 349. In *Stevenson v. Hall,* 473 P.2d 581 (Wyo. 1970), a widow, from whom the executor had erroneously deducted a share of estate taxes, sued other distributees for contribution under the statute in an action filed in the trial court of general jurisdiction. Without discussion of the trial court's subject matter jurisdiction, the Supreme Court of Wyoming reversed, as to the other distributees, a dismissal that had been based on *res judicata. Id.* at 585–86. In an earlier proceeding, the widow had sought to have the probate

court revise the erroneous apportionment, but that application was held not to be timely. *In re Estate of Stevenson,* 445 P.2d 753 (Wyo.1968). In the later action by the widow, the Supreme Court of Wyoming held that "the Uniform Estate Tax Apportionment Act contemplates and expressly authorizes such a suit as plaintiff has brought against persons who shared in the distribution of the Stevenson estate." *Stevenson v. Hall,* 473 P.2d at 585.

For all the foregoing reasons we hold that the circuit courts of this state have concurrent jurisdiction with the orphans' courts to apportion under TG § 7–308.

## II

The Shepters' counterclaim is best understood in relation to the JHU complaint. The latter pleading advances some broad theories in support of a declaratory judgment authorizing JHU, as trustee, to suspend or reduce annuity payments as a means of recovering from the Shepters some portion of the estate taxes paid by JHU in addition to those apportioned to the joint accounts and to the gift of the house.[3] Counts I and II of the Shepters' amended counterclaim attempt to allege estate planning malpractice and claim $500,000 damages. Count III of the counterclaim is discussed in Part II.B., *infra.*

## A

Count I averred that JHU "breached its duty" to Edward, Elsie, and the Shepters in the creation of the trust.

---

**3.** For example, ¶ 41 of the complaint alleges:

"Considering the minimal value of Hopkins' remainder, this trust represents not a charitable transfer by the Shepters, but simply an investment. The Shepters bargained for, and got, an extremely high tax-free yield with no custodial or management fees. Hopkins got the right to the remainder, but only if it could manage the trust astutely enough to ensure that there was a remainder at all. The trust was nothing more than a contract between Hopkins and the Shepters, entered into with full consideration on both sides. To rewrite that contract now by providing that Hopkins must pay a substantial federal estate tax without any concomitant reduction in its obligations under the contract deprives Hopkins of the consideration paid by the Shepters in exchange for the annuities."

As a result "the trust as planned and presented to [Edward and Elsie] has failed to qualify and is subject to significant tax assessments and penalties," and the Shepters were allegedly damaged. Count II, in which the individual representatives of JHU are joined, makes the additional allegation that the "trust has failed to qualify as what it purports to be, a charitable remainder annuity trust."

JHU moved to dismiss. In a memorandum in opposition to dismissal the Shepters describe their damages as including "the significant tax liability and penalties that [JHU] paid to the IRS and is now seeking to recoup from the Shepter Beneficiaries as a result of the failure of the Trust to qualify as a Charitable Remainder Annuity Trust."

JHU's motion to dismiss the Shepters' counterclaim was argued at the same time as JHU's motion for partial summary judgment. One exhibit to the affidavit supporting the motion for summary judgment was the final IRS report of estate tax examination under which Elsie's return was adjusted from one with no charitable deductions to reflect $6,700 as the value of the charitable remainder annuity trust. Thus, it appears that the theory of the Shepters' counterclaim is that JHU and its representatives should have produced an estate plan, satisfying the objectives of Edward and Elsie, that would also reduce the estate taxes in Elsie's estate by a significantly greater margin than the reduction effected by the $6,700 deduction for the charitable remainder annuity trust.

Maryland Rule 2–305 requires that

"[a] pleading that sets forth a claim for relief ... shall contain a clear statement of the facts necessary to constitute a cause of action...."

The Shepters' counterclaim violates Maryland Rule 2–305. The allegations of the counterclaim are simply conclusory and not factual. That counterclaim does not allege what JHU did or failed to do, or how those acts or omissions resulted in a substantial increase in estate taxes. *See Nigido v. First Nat'l Bank*, 264 Md. 702, 708–11, 288 A.2d 127, 129–31 (1972) (facts, not merely conclusions, must be alleged to state a cause of

action); *Bohlen v. Glenn L. Martin Co.*, 193 Md. 454, 463, 67 A.2d 251, 255 (1949) (To state a cause of action in negligence, "[t]he facts alleged in the declaration must show that plaintiff's injury was the proximate and natural result of some lack of care or diligence. . . ."); P. Sandler & J. Archibald, *Pleading Causes of Action in Maryland* § 1.1, at 2 (1991) ("[T]here is a substantial difference between the requirements of federal notice pleading and the more stringent requirements of Maryland Rule 2–305.").

The Shepters had recognized the potential deficiency of the amended counterclaim, and, prior to the hearing in the circuit court, they tendered a second amended counterclaim.[4] At the hearing their counsel described the tendered pleading as "more precise and sets out the causes of action more precisely than we did before." The circuit court did not conceal its skepticism over whether anyone could have devised an estate plan that produced a substantial charitable deduction in Elsie's estate for the gift to JHU when that gift followed three generations of life interests. This prompted the Shepters to seek permission to submit a further memorandum in which they would explain how they had been injured by the negligence of JHU. The trial court allowed them two weeks, but the Shepters did not avail themselves of that opportunity. Rather, they advised the court that it could rule, without their providing "an estate planning explanation of how [the counterclaim defendants] could have done a better job."

The circuit court did not err in thereupon granting the motion to dismiss as to Counts I and II of the counterclaim, and, under the circumstances, the circuit court did not abuse its discretion in denying leave to file the tendered, second amended counterclaim.

## B

Under the heading of Count III of the amended counterclaim the Shepters asked that a declaratory judgment be

---

**4.** The amended counterclaim had been drafted by prior counsel for the Shepters. The tendered second amended counterclaim was signed jointly by prior counsel and by the Shepters' present counsel.

entered contrary to that sought by JHU. The relief that they sought included a judgment declaring that JHU is liable for the estate taxes and that JHU must continue to make the annuity payments as a matter of contract. The Shepters allege that the claim asserted by JHU is barred by laches and that JHU "caused or contributed to the problems from which it now seeks relief." These allegations do not constitute an independent counterclaim; rather, they raise matters of defense to JHU's complaint for declaratory judgment.[5]

Thus, the claim that is the subject of Count III is the claim of JHU for that portion of the tax attributable to the annuity.[6] JHU's claim is still pending, unadjudicated, in the circuit court. Because Count III of the counterclaim does not involve any separate claim or parties, its dismissal could not be certified as a final judgment under Maryland Rule 2–602. *See Washington Suburban Sanitary Comm'n v. Frankel,* 302 Md. 301, 487 A.2d 651 (1985); *East v. Gilchrist,* 293 Md. 453, 445 A.2d 343 (1982). Consequently, the appeal from the "judgment" on Count III of the counterclaim will be dismissed.

### III

▮ Ann appeals from the summary judgment entered against her for the estate tax apportioned to the transfer by survivorship to her of the bank accounts of Elsie, and George

---

5. In their reply brief the Shepters submit that the counterclaim seeks only recoupment. Construing the counterclaim as a whole we read Counts I and II to seek affirmative relief in excess of the JHU claim, while Count III seeks to use only defensively any errors attributable to JHU.

6. Unlike the apportionment underlying the summary judgment, the claim of JHU for a portion of the tax attributable to the annuity does not rest on a straightforward application of the Maryland Uniform Estate Tax Apportionment Act. TG § 7–308(f) provides:

   "An interest in income, an estate for years, an estate for life, or any other temporary interest in any property or money is not subject to apportionment between the temporary interest and the remainder. The tax on the temporary interest and the tax, if any, on the remainder is chargeable against the corpus of the property or money subject to the temporary interest and the remainder."

appeals from the summary judgment entered against him for the tax apportioned to the transfer to him of Elsie's home.[7] They contend that there is a genuine dispute of material fact that prevents summary judgment because the dispute concerning the extent to which JHU may recover tax attributable to the annuity has not been resolved. That dispute is immaterial to the summary judgments. Each apportionment judgment is based on amounts that are not subject to revision. The final valuation used for Elsie's estate tax for each gift respectively forms the numerator of a fraction, the denominator of which is the total value of "the interests of all persons interested in the estate." TG § 7–308(b). Each ratio is then applied to the total tax actually paid. Whatever disposition ultimately is made of the controversy concerning who pays how much of the tax attributable to the annuity, it will have no effect on the summary judgments.

■ George contends that TG § 7–308 does not authorize apportionment of the value of the home because, under amendments to the IRC made by Congress after Maryland adopted the Uniform Act, the transfer to him is not treated as part of the "taxable estate," IRC § 2001(b)(1)(A), but it is reported on the return as an "adjusted taxable gift," IRC § 2001(b)(1)(B). The change to which George refers is the adoption of the unified gift and estate tax and of the unified credit. *See generally* 1 Fed.Est. & Gift Tax Rep. (CCH) ¶ 5000. Following that change in the IRC, the National Conference of Commissioners on Uniform State Laws saw no need to amend the Uniform Act to address the change, and the General Assembly has not done so. Nevertheless, apportionments continue to be made of the total estate tax imposed by IRC § 2001. This practical contemporaneous construction, that has existed for seventeen years, reflects that "[t]ax," as used in TG § 7–308(a)(5), and elsewhere in that statute, today means the tax imposed by IRC § 2001, to be computed by

---

7. These judgments have been paid but are nevertheless appealable. *Franzen v. Dubinok,* 290 Md. 65, 427 A.2d 1002 (1981).

including values reported on the return as "adjusted taxable gifts" per IRC § 2001(b)(1)(B).

*THE APPEAL FROM THE ORDER OF THE CIRCUIT COURT FOR BALTIMORE CITY DISMISSING COUNT III OF THE APPELLANTS' AMENDED COUNTER-CLAIM AND THIRD–PARTY COMPLAINT IS DISMISSED. IN ALL OTHER RESPECTS THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY ARE AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.*