REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2215

September Term, 2013

_____

DANIEL J. MARGOLIS

v.

SANDY SPRING BANK

_____

Kehoe,
Arthur,
Eyler, James R.,
  (Retired, Specially Assigned),

JJ.

_____

Opinion by Arthur, J.

_____

Filed: February 26, 2015

When a bank processes a customer's ATM and debit-card transactions, it can proceed in at least two different ways. It can process the transactions in chronological order, by which it debits the amount of the first transaction first and the last transaction last. Or it can engage in what is called "batch-processing," by which it organizes the transactions by dollar amount and then debits the largest transactions first and the smallest transactions last. By engaging in batch-processing and processing the largest transactions first, the bank increases the likelihood of overdrafts – and of overdraft fees.

In this case, Daniel J. Margolis, as the representative of a putative class, brought a Consumer Protection Act challenge to Sandy Spring Bank's practice of batch-processing debit-card transactions (a.k.a. "point-of-sale" or "POS" transactions) and ATM transactions. The Circuit Court for Montgomery County dismissed his complaint for failure to state a claim upon which relief can be granted.

### QUESTIONS PRESENTED

Margolis presents two questions for our review, which we have consolidated and rephrased as follows: did the trial court err by granting Sandy Spring's motion to dismiss?[1] For the reasons that follow, we answer in the negative and affirm the judgment

---

[1] Margolis formulated the questions as follows:

1. Did the trial court err in holding that the Maryland Legislature endorsed the bank practice of always reordering debit card transactions from highest amount to lowest amount in order to create more fees for banks when the cited statute does not apply to such transactions?

2. Did the trial court err in dismissing Margolis' claim of an unfair or

of the circuit court.

**A.     The Complaint**

Margolis maintained a checking account with Sandy Spring.  The account had overdraft protection, under which the bank would pay for a transaction despite an overdraft of available funds, but would charge a fee of $37.00.

Margolis claimed that he incurred overdraft fees because the bank reordered ATM and debit-card transactions in his account, debiting the largest transactions first.  On June 20, 2013, he filed suit against Sandy Spring, claiming that the bank had committed unfair and deceptive trade practices in violation of Maryland's Consumer Protection Act ("CPA"), Code (1975, 2013 Repl. Vol.), Commercial Law Article ("CL"), § 13-301.[2]

The complaint alleged that the bank reorders transactions at the end of each business day, deducting the largest debits or withdrawals first and continuing thereafter from largest to smallest in descending order.  The complaint specifically alleged that Sandy Spring manipulated the order of transactions to increase overdraft fees – and the resulting profits.

---

deceptive trade practice when the Complaint clearly alleged that Sandy Spring wrongfully concealed its practice of always reordering debit transactions to the detriment of consumers, thereby costing its customers substantial sums of money?

[2] Margolis also alleged conversion, but he does not pursue that claim on appeal. *See Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 258 n.3 (2004) (collecting cases) ("[a]s a general rule, money, i.e., currency, is not subject to a claim of conversion unless the plaintiff seeks to recover specific segregated or identifiable funds").

By way of example, suppose a Sandy Spring customer's account contained $100.00, and the customer used her debit card for a $10.00 transaction, followed by a $20.00 transaction, and finally a $90.00 transaction. If Sandy Spring processed the transactions in chronological order, the customer would overdraw her account only when she made the final $90.00 debit, and the bank would charge only a single overdraft fee. However, when the bank batch-processes these same transactions and reorders them from largest to smallest, the bank first deducts $90.00, then $20.00, and lastly $10.00. Under batch-processing, therefore, the account becomes overdrawn at the second transaction, for $20, and the customer incurs two overdraft fees.

In his complaint, Margolis principally alleged that the bank violated the CPA because its Deposit Account Agreement did not disclose, or did not adequately disclose, the practice of batch-processing transactions by reordering them from largest to smallest. He also alleged that the bank did not adequately inform its customers of their ability to opt out of overdraft-protection services, under which the bank pays a transaction despite an overdraft, but charges an overdraft fee. At various points, he also alleged that the bank processes debits before credits. Finally, he alleged that the bank did not adequately identify overdraft fees.

Margolis invoked three provisions of the CPA: section 13-301(2)(i), concerning representations that "consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have"; section

3

13-301(3), concerning the "[f]ailure to state a material fact if the failure deceives or tends to deceive"; and section 13-301(9)(i), concerning "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he promotion or sale of any . . . consumer service."[3]

## B.    The Deposit Account Agreement

The bank's Deposit Account Agreement contains a number of provisions that bear on the adequacy of its disclosures.[4]

On the subject of overdrafts, the section captioned "Fees for Checks and Other Items or Incoming Collections" lists the fees that the bank may charge in case of overdrafts:

> **Overdraft**, NSF Return or Unavailable Funds (UAF) Overdraft Item: **a withdrawal or an order presented for payment that would overdraw an account** or is drawn against unavailable funds (fee not applicable to commercial checking UAF items that are paid or returned) **$35 per**

---

[3] Margolis did not invoke section 13-301(1), which concerns a "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers."

[4] Although Margolis did not attach the Deposit Account Agreement to his complaint, he expressly referred to it and repeatedly alleged that its disclosures did not satisfy the CPA. In response, the bank attached the Deposit Account Agreement to its motion to dismiss. Because there was no dispute that the Deposit Account Agreement was the agreement between Margolis and the bank, the circuit court could and did regard it as "simply supplementing the allegations in the complaint." *Smith v. Danielcyzk*, 400 Md. 98, 105 (2007); *Tri-County Unlimited, Inc. v. Kids First Swim Sch. Inc.*, 191 Md. App. 613, 619-20 (2010).

**withdrawal or order paid or returned**. . . . **The types of withdrawals or Orders subject to an overdraft**, NSF Return or UAF fee **include** negotiable orders of withdrawal, checks, substitute checks, electronified checks, "counter/in-person" withdrawals, drafts, **ATM withdrawals, point of sale purchases** . . . .

In addition, paragraph 2 of the General Rules of the Deposit Account Agreement

states:

> We reserve the right at our discretion to pay or refuse to pay any Order executed by you if the balance in the Account is insufficient or uncollected. In either case, we will charge you a fee for each of such Orders to your Account . . . . You may not be notified prior to our payment of any Order that may result in an overdraft . . . .

On the crucial subject of batch-processing, the Deposit Account Agreement had

this to say:

> **We may accept, pay or charge to your Account your Orders in any order we choose even if (a) paying a particular Order results in an insufficient balance** in your Account to pay one or more other Orders that otherwise could have been paid out of your Account; **or (b) using a particular order results in** the payment of fewer Orders or **the imposition of additional fees. In general, we currently process your Orders, including but not limited to ATM and POS transactions** and community office withdrawals, **at the end of each business day in high to low dollar amount.** If there are insufficient funds to cover all of your Orders processed on any given day, this method may result in additional overdraft fees. We may establish different processing priorities or categories for some Orders (i.e., wire transfer requests, automatic loan payments or automatic transfers). We reserve the right to change our policy at any time without notice to you.

Finally, the Overdraft Disclosure and Confirmation Notice, which is incorporated

into the Deposit Account Agreement, states:

> At any time if you decide that you no longer want to have our standard

5

overdraft services for ATM and one-time debit card transactions, please contact us . . . .

On the basis of the disclosures in the Deposit Account Agreement, Sandy Spring argued, among other things, that the complaint failed to state a claim for unfair and deceptive trade practices under the CPA.[5]

## C.    Motion to Dismiss

On November 15, 2013, the Circuit Court for Montgomery County held a hearing on Sandy Spring's motion to dismiss.  At the hearing, Sandy Spring argued that it had fully disclosed its practice of batch-processing and its customer's right to opt out of overdraft protection and also that section 4-303(b) of the Uniform Commercial Code, Code (1975, 2013 Repl. Vol.), § 4-303(b) of the Commercial Law Article ("CL"), expressly permitted banks to reorder transactions.  The latter argument appeared to register with the circuit court, which asked Margolis's counsel, "[H]asn't the Maryland legislature approved [batch processing] by saying that the bank can order [the transactions] or re-order [the transactions] in any order that it wants under the commercial law article that's cited by the defendants herein?"[6]

---

[5] Sandy Spring also argued that Margolis had agreed to the overdraft charges and could not predicate a conversion claim upon them; that he had waived any claims for overdraft fees; and that limitations barred at least some of his claims.  Those arguments are not part of the current appeal.

[6] Section 4-403(b) states that "*items* may," in general, "be accepted, paid, certified, or charged to the indicated account of its customer in any order."  (Emphasis added.)  As discussed below, an "item" is a negotiable instrument, such as a check; ATM withdrawals and POS or debit-card transactions are not "items."

6

At the conclusion of the hearing, the court granted the motion for "the reasons set forth in [the defendant's] motion and in [the defendant's] reply." The court added:

> [W]hile I may not personally be thrilled about the process or the practice of the bank making all this money at the expense of the customers, it appears to me that the Maryland legislature has, . . . said it's okay, when they specifically authorized the bank to go ahead and re-order them in any fashion that they want.

The court issued a written order entered December 11, 2013. The order does not provide any additional explanation of the court's rationale; it incorporates the reasoning "more fully discussed during the hearing" on November 15, 2013.

On January 3, 2013, Margolis noted this timely appeal.

## DISCUSSION

### A.     Standard of Review

In deciding a motion to dismiss a complaint, a circuit court assumes the truth of the complaint's factual allegations and of any reasonable inferences that can be drawn therefrom. *See*, *e.g.*, *Patton v. Wells Fargo Fin. Md., Inc.*, 437 Md. 83, 95 (2014) (citing *Bobo v. State*, 346 Md. 706, 708 (1997)). A court, however, need not accept the truth of pure legal conclusions. *See*, *e.g.*, *Shepter v. Johns Hopkins Univ.*, 334 Md. 82, 103 (1994); *John B. Parsons Home, LLC v. John B. Parsons Found.*, 217 Md. App. 39, 69 (2014) (quoting *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 335 (2009)) ("'[m]ere conclusory charges that are not factual allegations need not be considered'"). Moreover, "[a]ny ambiguity or uncertainty in the allegations bearing on whether the complaint states

a cause of action must be construed against the pleader." *Shenker*, 411 Md. at 335; *John B. Parsons*, 217 Md. App. at 69.

A court should dismiss a complaint for failure to state a claim only if the alleged facts and reasonable inferences would fail to afford relief to the plaintiff. *Bobo*, 346 Md. at 709.

This Court conducts a *de novo* review of the circuit court's granting of a motion to dismiss, *see Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 142 (2012), applying the same standard as the circuit court and determining whether that decision was legally correct. *See Reichs Ford Rd. Joint Venture v. State Roads Comm'n*, 388 Md. 500, 509 (2005) (citing *Adamson v. Corr. Med. Servs.*, 359 Md. 238, 246 (2000)). "The appellate court accords no special deference to the circuit court's legal conclusions." *Patton*, 437 Md. at 95.

**B.     CL § 4-303(b)**

Margolis argues that the circuit court erred in relying on CL section 4-303(b) to conclude that the General Assembly has authorized batch-processing of electronic debits. He argues that section 4-303(b) relates only to tangible negotiable instruments, such as checks, and does not apply to the debit and ATM transactions that are at issue in this case. Sandy Spring concedes that section 4-303(b) does not apply to electronic transactions, but argues that the court's reliance on the statute amounted to harmless error. We agree that section 4-303(b) does not apply to electronic transactions, but also agree that the court's

8

reliance on the statute was ultimately immaterial.

Section 4-303(b) provides, in pertinent part, that "items may be accepted, paid, certified, or charged to the indicated account of its customer in any order." This provision is a word-for-word adoption of section 4-303(b) of the Uniform Commercial Code ("U.C.C."). *See* U.C.C. § 4-303(b) (2014).[7]

Whereas the language of section 4-303(b) seems to bestow discretion on the banks to use the posting order of their choice, the courts have interpreted Article 4 of the U.C.C. *not* to apply to ATM and debit transactions. *See In re Checking Account Overdraft Litig. (MDL)*, 694 F. Supp. 2d 1302, 1315 n.9 (S.D. Fla. 2010) ("[t]he banks rely on [section] 4-303(b) of the UCC . . . . The UCC drafters however did not include transactions initiated by means of a credit card or debit cards in its endorsement of high-to-low posting"); *Hospicomm, Inc. v. Fleet Bank, N.A.*, 338 F. Supp. 2d 578, 586 (E.D. Pa. 2004) (holding that "Article 4 does not contemplate electronic withdrawals").

In reaching this conclusion, courts have reasoned that U.C.C. Article 4 applies only to an "item," *see*, *e.g*, *Hospicomm*, 338 F. Supp. 2d at 586; *Sinclair Oil Corp. v. Sylvan State Bank*, 254 Kan. 836, 843 (1994), which means an "instrument or a promise or order to pay money handled by a bank for collection or payment." U.C.C. § 4-104(a)(9); *accord* CL § 4-104(a)(9). An "instrument," in turn, means "a negotiable

---

[7] Under section 4-303(b), a bank's right to accept, pay, certify, or charge the account is subject to the obligation, in section 4-303(a), to honor a stop-payment order, legal process, or a right of setoff exercised by a payor bank.

instrument," *see* U.C.C. § 3-104(b); CL § 3-104(b); such as a check. By its terms, therefore, Article 4 does not apply to electronic-funds transactions, such as ATM withdrawals or debit-card or POS purchases. Instead, as other courts have recognized, electronic-funds transactions are governed by the federal Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq. See*, *e.g.*, *Hospicomm*, 338 F. Supp. 2d at 586.[8]

Nonetheless, because the circuit court's reliance on section 4-303(b) was in the nature of an alternative holding, the error does not require reversal unless the court also erred in holding that Margolis failed to allege violations of the CPA. *Cf. Schneider v. Little*, 206 Md. App. 414, 443 (2012), *rev'd on other grounds*, 434 Md. 150 (2013) (quoting *Barksdale v. Wilkowsky*, 419 Md. 649, 657 (2011)) ("'[i]t has long been the policy in this state that [appellate courts] will not reverse a lower court judgment if the error is harmless'").

## C.    The Consumer Protection Act

Maryland's CPA, CL section 13-303, proscribes businesses, including banks, from engaging in unfair or deceptive trade practices, as defined in CL section 13-301. Margolis argues that the circuit court erred by dismissing his CPA claim because, he says, his complaint sufficiently alleged that Sandy Spring violated the CPA by engaging in

---

[8] Although Article 4A of the U.C.C. concerns electronic transactions, it applies only to fund transfers *to* banks, such as wire transfers (*see* U.C.C. § 4A-104; CL § 4A-104); it does not apply to ATM withdrawals by a consumer or to debit-card or POS payments to a merchant.

unfair or deceptive trade practices. Sandy Spring responds that it adequately disclosed its overdraft policies to its customers and therefore that the circuit court properly dismissed the CPA claim.

Margolis identifies a number of banking practices that, in his view, violate the CPA:

- reordering transactions from high to low;

- charging overdraft fees when accounts had a positive balance;

- reordering multiple days' worth of transactions;

- preventing customers from ascertaining their actual account balances;

- charging fees which far exceed the amount by which an account is overdrawn and which are not reasonably related to Sandy Spring's cost of covering the overdraft;

- failing to obtain customer consent before processing debit transactions which overdraw customer accounts; and

- failing to notify customers of their ability to opt-out of overdraft services and related fees.

In addition, at various points, Margolis alleges that the bank processes credits before debits, although he does not clearly claim to have suffered damages as a result of that alleged practice.

Because Margolis's CPA claims allege material misstatements or omissions in the

11

Deposit Account Agreement, the language of that document is of paramount importance.

Margolis can state a claim only if the agreement contains a false representation under

section 13-301(2)(i) (*i.e.*, a "representation" that the bank's services "have a . . .

characteristic which they do not have"); the "[f]ailure to state a material fact" under

section 13-301(3); or "[d]eception, fraud, false pretense, false premise, misrepresentation,

or knowing concealment, suppression, or omission of any material fact," under section

13-301(9).[9]

Our examination of the language of the agreement leads us to conclude that

Margolis did not sufficiently allege that the bank engaged in an unfair or deceptive trade

practice in contravention of the Act.

## 1. Reordering Transactions from High to Low

Margolis predicates a CPA violation on what he calls the bank's alleged

"concealment" of its practice of batch-processing.  Yet, the Deposit Account Agreement

plainly provides that, "[i]n general," the bank "currently process[es] [a customer's]

Orders, including but not limited to ATM and POS transactions . . . at the end of each

business day in high to low dollar amount."  In view of that explicit disclosure, there is

simply no factual basis for the allegation that the bank somehow concealed its practice of

batch-processing ATM and POS transactions "in high to low dollar amount."  *See Hassler*

---

[9] Margolis frequently focuses on the fairness of the bank's practices rather than on what the bank said (or failed to say) about them.  Under the CPA claims that he has attempted to allege, however, we are concerned only with the bank's representations or material omissions.

12

*v. Sovereign Bank*, 644 F. Supp. 2d 509, 515-16 (D.N.J. 2009), *aff'd*, 374 Fed. Appx. 341 (3d Cir. 2010) (rejecting challenge to batch-processing under New Jersey Consumer Fraud Act because agreement contained very information plaintiff alleged to have been misrepresented, suppressed, or concealed).

Margolis counters that the agreement is still misleading because the document states that Sandy Spring "general[ly]" processes the largest transactions first, while he claims that Sandy Spring "always" processes those transactions first. From the standpoint of disclosure under the CPA, we see this as an immaterial distinction without a difference. *See Golt v. Phillips*, 308 Md. 1, 10 (1986) (stating that "an omission is considered material if a significant number of unsophisticated consumers would attach importance to the information in determining a choice of action"); *see also Luskin's, Inc. v. Consumer Protection Div'n*, 353 Md. 335, 358-59 (1999) (holding that under the CPA materiality information that is important to customers and, hence, likely to affect their choices). If customers have been informed that "in general" their bank "currently" processes the largest ATM or POS transactions before the smaller ones, as Sandy Spring's customers have, they are exceedingly unlikely to risk an overdraft in the hope that in that given instance the bank might depart from its "general," "current[]" method of calculating whether their accounts are overdrawn.

Finally, Margolis cites a number of out-of-state cases in which federal courts have denied motions to dismiss challenges to batch-processing. None of those cases, however,

13

involves a misrepresentation-based claim, like Margolis's, under a statute like the CPA.

Instead, the cases typically involve theories of good faith and fair dealing or

unconscionability.  *See*, *e.g.*, *In re Checking Account Overdraft Litig.*, 883 F. Supp. 2d

1244 (S.D. Fla. 2012); *Hughes v. TD Bank, N.A.*, 856 F. Supp. 2d 673 (D.N.J. 2012); *In*

*re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010); *White v.*

*Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358 (N.D. Ga. 2008).  Indeed, even where those

cases discuss whether the defendant did something that was "misleading," they speak of

the amorphous concept of misleading *practices*, *see Hughes*, 856 F. Supp. 2d at 679-80;

*In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1325; *White*, 563 F. Supp. 2d

at 1369-70; not the misleading *representations* that Margolis's CPA claim alleges.  In

short, the out-of-state cases afford no support for Margolis's allegation that Sandy Spring

violated the CPA by "conceal[ing]" its practice of batch-processing ATM and POS

transactions.[10]

### 2.  Charging Fees on Accounts with Positive Balances

Margolis repeatedly asserts that Sandy Spring charges overdraft fees on accounts

that have positive balances.  Upon examination, however, Margolis really means only that

the bank charges overdraft fees on accounts that would have had positive balances had

---

[10] Both parties cite a number of unreported federal decisions concerning the propriety of batch-processing under the law of various states.  "However, it is the policy of this Court in its opinions not to cite for persuasive value any unreported federal or state court opinion."  *Kendall v. Howard County*, 204 Md. App. 440, 445 n.1 (2012), *aff'd*, 431 Md. 590 (2013).

the bank processed the transactions in chronological order – *i.e.*, that the bank charges overdraft fees on accounts that would have had positive balances had the bank not engaged in batch-processing and not debited the largest transactions first. Viewed in this way, this assertion is merely a variation of Margolis's allegation that batch-processing violates the CPA. Because we have concluded that the bank adequately disclosed its practice of batch-processing ATM and POS transactions, we reject Margolis's contentions concerning the alleged practice of charging fees on accounts with positive balances.

### 3. Reordering Multiple Days' Worth of Transactions

In the paragraph concerning batch-processing, the Deposit Account Agreement expressly states that, "[i]n general," the bank processes ATM and POS transactions "at the end of each business day." There is no ambiguity about what a "business day" means, nor is there any question that Saturdays, Sundays, and holidays are not "business days." Hence, the agreement adequately discloses that the bank generally waits until the end of the first business day after a weekend or holiday before processing the transactions that have occurred during that period. Because the agreement also discloses that the bank generally processes the transaction "in high to low dollar amount," it adequately discloses the practice of aggregating ATM and POS transactions over a weekend or holiday and batch-processing them by debiting the largest of the transactions first.

### 4. Preventing Customers from Ascertaining Balances

Margolis appears to allege that the bank misinforms its customers about their account balances if they check their balances before the bank has batch-processed the transactions in the account at the end of the "business day." The short answer is that, in view of the bank's disclosures, a reasonable customer would understand that it is impossible to ascertain the precise account balance until after "the end of each business day." Because the bank clearly discloses that it "general[ly]" does not process transactions in chronological order but rather in "high to low dollar amount," and that it reserves the right to process the transactions "in any order" that it chooses even if its choice results in an overdraft and additional fees, a reasonable customer would understand that he or she can receive only a provisional disclosure regarding the account balance before the end of the business day.

### 5. Charging Excessive Overdraft Fees

In the section of the Deposit Account Agreement captioned "Fees for Checks and Other Items or Incoming Collections," Sandy Spring discloses the precise amount of the fee that it charges for overdrafts. The bank does not represent that the fee relates in any way to the cost of covering the overdraft. Nor does the bank represent that the fee will bear some relationship to the amount of the overdraft. Rather, it discloses that it will charge a flat fee regardless of the size of the overdraft. In these circumstances, Margolis has presented no ground to support a misrepresentation-based claim under the CPA for the imposition of excessive overdraft fees.

16

## 6. Failure to Disclose Ability to Opt Out

Margolis complains that the bank does not notify customers of their ability to opt-out of the overdraft services and related overdraft fees. To the contrary, the Overdraft Disclosure and Confirmation Notice expressly advises customers to contact the bank "[a]t any time if you decide that you no longer want to have our standard overdraft services for ATM and one-time debit card transactions." In view of that disclosure, Margolis has no factual basis for his CPA claim based on an alleged failure to disclose the ability to opt out.

## 7. Processing Debits Before Credits

The Deposit Account Agreement states that the bank may "accept, pay or charge . . . *Orders* in any order we choose even if (a) paying a particular Order results in an insufficient balance . . . or (b) using a particular order results in . . . the imposition of additional fees." (Emphasis added.) The definition of "Order," however, does not include "Deposits." To the contrary, the term "Deposits" has its own definition, separate from the definition of "Orders." Accordingly, the agreement does not authorize the bank to "accept, pay or charge" deposits in any order it chooses. In fact, the agreement states that deposits "will be posted before Orders."

Margolis's complaint includes a single, passing allegation about being assessed fees, in an undisclosed amount, because the bank processes debits before credits. The allegation, which appears in paragraph 30, reads as follows:

17

Plaintiff (i) maintained an account with Sandy Spring; (ii) initiated multiple electronic funds transfers with an ATM or debit card issued by Defendant; and (iii) was actually assessed one or more overdraft fees or charges for an ATM or one-time debit card transaction as a result of Sandy Spring's practice of holding debit card transactions, resequencing the transactions from highest to lowest, and processing debits before credits.

This allegation does not appear in the section concerning damages or harm, but in the section concerning Margolis's adequacy as a class representative. Moreover, the allegation does not unambiguously state that the bank actually assessed any fees against him solely because it had processed debits before credits. Instead, Margolis seems to allege that he incurred fees because of some combination of multiple factors: the bank's practice of holding debit-card transactions (apparently until the end of a business day); of reordering the transactions from highest to lowest; and of processing debits before credits. Indeed, the focus of Margolis's complaint (and his brief to this Court) was on batch-processing; processing debits before credits was less than an afterthought. Margolis said nothing about processing debits before credits even though the bank's disclosures said nothing about it.

In these circumstances, Margolis has not satisfied the "'stringent requirements of Maryland Rule 2-305,'" *Shepter*, 334 Md. at 104 (quoting P. Sandler & J. Archibald, *Pleading Causes of Action in Maryland*, § 1.1, at 2 (1st ed. 1991)), under which a complaint must "contain a clear statement of the facts necessary to constitute a cause of action." Md. Rule 2-305. Simple notice pleading does not suffice. *Shepter*, 334 Md. at 104.

18

In view of the absence of factual allegations, as opposed to ambiguous conclusory assertions, in the complaint, Margolis failed to state a claim concerning the bank's alleged practice of processing debits before credits. *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 365 (2012) (affirming dismissal of complaint where plaintiffs did not sufficiently allege that they suffered actual injury because of CPA violation).[11]

### D. The Duty of Good Faith and Fair Dealing

Although Margolis did not assert a claim for breach of contract, he frequently refers to Sandy Spring's implied contractual obligation of good faith and fair dealing. Those references typically occur in connection with his citation of federal trial court decisions that interpret the implied covenant of good faith and fair dealing under the law of states other than Maryland. Those cases typically state that, where a bank has the contractual right to exercise discretion in ordering ATM and POS transactions, it must

---

[11] Even if Margolis had alleged a misrepresentation or material omission sufficient to trigger liability under the CPA, he would not have stated a claim under section 13-301(9). That subsection "replicates common-law fraud insofar as it includes '[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods. . . .'" *McCormick v. Medtronic, Inc.*, 219 Md. App. 485, 529 (2014) (quoting CL § 13-301(9)). "Accordingly, if a party alleges an 'unfair or deceptive trade practice' under that specific subsection, he or she must allege fraud with particularity[.]" *Id.* Among other things, the requirement of particularity means that a plaintiff must allege "why a finder of fact would have reason to conclude that the defendant acted with scienter (*i.e.*, that the defendant either knew that the statement was false or acted with reckless disregard for its truth) and with the intention to persuade others to rely on the false statement)." *Id.* Because the complaint makes no effort to plead this aspect of fraud with anything resembling particularity, it does not state a claim for a violation of section 13-301(9).

exercise its discretion in good faith. *See*, *e.g.*, *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1315.

Under Maryland law, the implied covenant of good faith and fair dealing ordinarily imposes no affirmative obligations outside the express terms of the contract itself. *See Polek*, 424 Md. at 363; *see also Blondell v. Littlepage*, 413 Md. 96, 113 (2010) (implied duty of good faith and fair dealing generally "concerns the 'performance and enforcement' of the contract itself"). Hence, even if Margolis had alleged a breach of contract, which he did not do, it is difficult to envision how the implied covenant would advance his case, as he did not charge the bank with doing anything other than what it had the express contractual right to do. *See Blondell*, 413 Md. at 114-15.

In any event, the implied covenant has no real bearing on Margolis's CPA claim, because that claim turns on whether the bank made false representations or failed to disclose material facts. Because we hold that the complaint did not adequately allege false representations or material omissions in violation of the CPA, we affirm the circuit court's decision to dismiss it with prejudice.

## CONCLUSION

In affirming the dismissal of Margolis's CPA claim, we should not be understood to have endorsed the bank's practice of maximizing fees by reordering transactions to create overdrafts where they would not otherwise exist. We hold only that the Margolis's allegations did not suffice to state a claim that the bank "concealed" its practices in

20

violation of the CPA.  Sandy Spring adequately disclosed those practices, and Margolis was free to reject its services and to look for another bank with less onerous overdraft policies if he so chose.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.  COSTS TO BE PAID BY APPELLANT.**