*Gambrill v. Board of Education of Dorchester County*, *et al.*, No. 0886, September Term 2019

Opinion by Friedman, J.

**COVERDELL ACT—FEDERAL PREMPETION**

Where the federal Coverdell Act applies, it provides teachers with immunity from suit, and this immunity "preempt[s] the laws of any State to the extent that such laws are inconsistent with this subpart, except that this subpart shall not preempt any State law that provides additional protection from liability relating to teachers." 20 U.S.C. § 7945(a). Maryland law provides teachers only with a right to indemnification, which is a lesser protection than immunity. Therefore, we hold that, under the circumstances presented, the immunity provided by the Coverdell Act is greater protection than the indemnity provided by State law, and thus preempts the state law.

**TORTS—SCHOOL BOARD LIABILITY—DEFERENCE TO DISCIPLINARY DECISIONS**

The process of disciplining students is an inherent part of the educational process. Therefore, we hold that claims of negligent student discipline, such as being too lenient or too harsh, are claims of negligent education, and as such are not cognizable causes of action under *Hunter v. Bd. of Educ. of Montgomery Co.*, 292 Md. 481 (1982).

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0886

September Term, 2019

_____

BRANDON GAMBRILL, ET AL.,

v.

BOARD OF EDUCATION OF
DORCHESTER COUNTY, ET AL.

_____

Reed,
Friedman,
Gould,

JJ.

_____

Opinion by Friedman, J.

_____

Filed: September 7, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The Gambrills brought a negligence action against teachers and administrators at their daughter's middle school for injuries their daughter suffered at the hands of her fellow students. The trial court granted the defendants' motion for summary judgment. As we will explain, we hold that the trial court correctly granted the motion for summary judgment and, therefore, affirm.

## FACTS[1]

During the 2016-17 school year, the Gambrills' daughter, S., was involved in several physical and verbal altercations with other students while in her sixth-grade year at Mace's Lane Middle School, a public school in Dorchester County. The first incident occurred on October 25th, 2016 when S. was attacked by Students 5 and 9 while in class with Substitute Teacher 1. The attack resulted in a concussion. Assistant Principal Cynthia Woolford completed Student Behavior Reports for Students 5 and 9 and issued them in-school suspensions. Principal Michael Collins apologized to the Gambrills for the incident and admitted that, "substitute teachers are not the best trained and cannot control the classroom." S. informed Woolford that she was having issues with Students 4 and 7 as well.

Woolford met with the Gambrills the day after the incident. The morning after her meeting with the Gambrills, Woolford changed S.'s schedule to minimize contact with the students S. identified. The change could not be given immediate effect, so Woolford

---

[1] To protect their privacy, we do not identify any of the children by name. We refer to the two substitute teachers by number, however, not to protect their identities but because their names are not disclosed by the record.

modified S.'s schedule to ensure that she would have limited contact with those students in the interim. With the new schedule, S. had no classes with Students 4, 5, and 9. Woolford was unable to move S. and Student 7 into separate classes, but instructed S.'s teachers to "keep [S. and Student 7] away from one another, as it is reasonably possible, and immediately report any interaction between these students."

In late November, Student 4 "walked out in the hall without permission to verbally attack [S.] who was standing in line across the hall. [Student No. 4] began shouting at [S.] saying, 'come on and fight me' and other inappropriate words." Woolford issued Student 4 an in-school suspension, and also arranged for external mediation between S. and Student 4, at which both S.'s mother and Student 4's mother were present. Then in early December, Woolford instructed S.'s teachers to change seating assignments because S. and Student 2 now had issues.

In mid-December, Student 8 grabbed S. by the neck and flipped her backwards. S. struck her head on a table, resulting in another concussion. This happened under the supervision of Substitute 2, who, according to the Gambrills' complaint, "ignored it because [he] was complaining of a headache." The Gambrills kept S. home from school until December 19th.

When S. returned to school, she yelled at Student 8, and "ran up and punched [Student 8] in the face." Woolford completed behavior reports for both students and issued each a two-day out of school suspension. On December 20th, the Gambrills notified the Board of Education of Dorchester County of their concerns regarding S.'s safety at school.

2

After the Gambrills contacted the Board, James C. Bell, the Supervisor of Student Services for Dorchester County, spoke with the administration at Mace's Lane Middle School about the Gambrills' concerns. To ensure S.'s safety going forward, the administration (1) issued S. a "flash pass" that she could use to immediately go to guidance or administration if she felt a conflict may escalate; (2) changed her locker location as the Gambrills requested; (3) changed her schedule as requested; and (4) continued to pursue external mediation as a possible solution.

Regardless, the altercations continued. On January 17th, Student 1 reported that S. threatened to fight her, and bumped into her on purpose. Woolford spoke to both students and issued a school-based "cease and desist." Woolford noted that S. and Student 1 are "neighbors and have been having community issues. Both parents have been through the court system to get resolution to this problem." Woolford also noted that, "[she has] never observed [Student 1] interacting with S. at any time, although S. states that [Student 1] has made threatening remarks."

According to the nurse's records, another student hit S. on January 23rd. On January 25th, S. was sent to the school nurse after eating lip balm and hand sanitizer. S. claimed that students dared her, but the teacher who sent S. to the nurse said that she "didn't believe anyone dared [S.]. I believe [S.] did this all on her own to get attention. [S.] was causing a major disruption, and unfortunately, she was enjoying every bit of it."

On February 3rd, S. went to the nurse after an altercation with Student 2. That afternoon, S.'s father sent the following email to Bell, the Supervisor of Student Services:

> Just want to know why no one called me to tell me my child was assaulted today by a boy and nothing was done. She told [Woolford] and [Woolford] just pushed it off like nothing happened. I am getting really pissed off with this school. Either you need to deal with it or I will just deal with this on my own terms. Because this is out of control!!

Bell referred the complaint to Charles Pinkett, a Pupil Personnel Worker with the Board of Education of Dorchester County. Pinkett investigated and emailed Bell on February 6th:

> Mrs. Woolford is still conducting the investigation. She still has one more teacher to talk to and should be done before the day is over. At the same time, I have also talked to a couple of students and there was "no creditable evidence" of any assault on the student. Will update as soon as investigation is completed.

Woolford's investigation concluded that no teachers had witnessed the alleged incident, and Student 2 denied that there was any altercation with S.

Later in February, Student 7 smashed a cupcake in S.'s face after S. was following her and others around, calling them names. Woolford issued Student 7 an in-school suspension. In March, S. told a student that she "wanted to cut [the student's] fingers off and eat them," and "if your brother comes home with a couple of bruises, you know who did it … would you mind if your brother comes home and dies, like I poisoned him?" On March 6th, Student 11's parent reported that S. would call Student 11 "penis" as a nickname, and told other students that she would "cut them and strangle them all while laughing."

There were other minor incidents throughout the spring semester, but the most serious occurred on May 8th. Student 4 ran out of her classroom and attacked S., and a full-

blown fistfight ensued. Student 4 was suspended with a recommendation of expulsion, and law enforcement was notified.

## PROCEEDINGS

On May 10th, the Gambrills filed a five-count Complaint in the Circuit Court for Dorchester County naming Bell, Collins, Woolford, Substitute 1, and Substitute 2 as defendants. The Gambrills also named the Board of Education for Dorchester County ("the Board") as a defendant under a respondeat superior theory of liability, and as provided below, for its allegedly negligent actions. **Count 1** alleged violations of S.'s State constitutional right to a "thorough and efficient" education. **Count 2** alleged violations of S.'s State constitutional right to due process. **Count 3** alleged a pattern or practice of improper conduct. **Count 4** alleged negligent hiring, training, retention, and supervision. And **Count 5** alleged general negligence against the teachers and their employer, the Board. The Gambrills voluntarily dismissed Counts 1 and 3. The circuit court then granted summary judgment as to the remaining counts. The Gambrills have appealed only from the grant of summary judgment as to Count 5.[2]

In granting summary judgment as to Count 5, the circuit court said:

---

[2] The Gambrills' brief states that it only "focuses" on Count 5 and, in fact, only presents argument in support of reversing summary judgment as to Count 5. Despite the lack of argument on any other grounds, counsel for the Gambrills took the position at oral argument that they were "appealing everything." That is not possible. The Maryland Rules require that to appeal from a decision, a party's brief must present "argument in support of the party's position on each issue." MD. R. 8-504(a)(6). Failure to present argument constitutes a waiver of the issue. *See, e.g., DiPino v. Davis*, 354 Md. 18, 56 (1999). Thus, any argument as to the other Counts of the Gambrills' Complaint are not at issue in this appeal.

With regard to the negligence claim, Count [5], I find that the individual Defendants in this case are entitled to summary judgment as a matter of law because they are entitled to statutory immunity. They're protected by the Paul D. Coverdell Teacher Protection Act of 2001.

The purpose of that statute is to provide teachers, principals, and other school professionals the tools they need to undertake reasonable actions to maintain order, discipline, and an appropriate educational environment. Those defendants are entitled to summary judgment with regard to that claim for the reason that there are no substantive or procedural due process violations, therefore that Act squarely covers them and provides them with immunity.

I find that the Board also is entitled to summary judgment as a matter of law. The negligent acts at issue here that are alleged were educational decisions and thus within the purview of *Hunter* [*v. Bd. of Educ. of Montgomery Cty.*, 292 Md. 481 (1982)] and *Gurbani* [*v. Johns Hopkins Health Sys. Corp.*, 237 Md. App. 261 (2018)].

No reasonable jury could conclude that the Defendants were negligent in supervising [S.] and other students at Mace's Lane [Middle School]. … [N]o reasonable jury could find that the … Defendant Board … breached [its] duty to protect her from foreseeable harm. I conclude … that a cause of action here would create that [sword] of Damocles[3] hanging over the heads of well-intentioned educators who are tasked with the job of resolving peer disputes among adolescents.

Again, I find that there is, not just an absence of evidence to support the allegations that the Defendants failed to adequately respond to, investigate, and prevent reasonably foreseeable harm to [S.], it's to the contrary, the evidence shows that the Defendants responded and took action in response to the allegations of [S.'s] family.

_____

[3] The transcript says, "sort of Damocles," but we are confident that the trial judge was referring to the ancient parable of the sword of Damocles, which hangs over the head and threatens those who wield power. *See Damocles*, WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY (2003).

I'm not sure if it amounts to contributory negligence or assumption of the risk, I'm not clear on that point, but the record does establish that at times [S.] was engaging her classmates and that she was involved in altercations with other students that could have contributed to the situation. Very much like the case law cited by defense counsel that ameliorated liability on behalf of the school board in other cases.

Thus, with respect to Count 5, the circuit court made three holdings: (1) that the individual defendants were entitled to statutory immunity under the Coverdell Act; (2) that the Board was entitled to summary judgment under the *Hunter* line of cases; and (3) that summary judgment was proper because no reasonable jury could find that the defendants were negligent.[4] We will review each of these holdings, without deference, to determine whether summary judgment was correct as a matter of law. *Laing v. Volkswagen of Am., Inc.*, 180 Md. App. 136, 152-53 (2008). We shall hold that the circuit court was legally correct in granting summary judgment for the individual defendants under the Coverdell Act, and in granting summary judgment to the Board under the *Hunter* line of cases. Because we affirm summary judgment on these grounds, and because of procedural defects in the Gambrills' briefing, we do not reach the circuit court's final holding that no reasonable jury could have found the defendants liable.[5]

---

[4] The circuit court also specifically declined to find as a matter of law that S. was contributorily negligent or assumed the risk. Likewise, we would decline to find her contributorily negligent or to have assumed the risk.

[5] We note, however, that, should a higher court disagree with our analysis, we would have held that the Gambrills have waived this theory because they did not present any argument that explains that the circuit court erred in this determination. *See*, *e.g.*, *DiPino*,

**ANALYSIS**

**I.** **THE INDIVIDUAL DEFENDANTS WERE ENTITLED TO IMMUNITY UNDER THE FEDERAL COVERDELL ACT**

The United States Congress enacted the Paul D. Coverdell Teacher Protection Act of 2001, 20 U.S.C. §§ 7941-48 as part of the No Child Left Behind Act of 2001. 20 U.S.C. §§ 6301-7981. The Coverdell Act states that it "shall only apply to States that receive [federal Elementary and Secondary Education Act ("ESEA")] funds … and shall apply to a State as a condition of receiving such funds." 20 U.S.C. § 7944.[6]

---

354 Md. at 56 (explaining that where "a point germane to the appeal is not adequately raised" the appellate court should decline to address it). Thus, we would affirm on this basis as well.

[6] The Gambrills' flagship argument is that the Board failed in its affirmative obligation to plead and prove its receipt of federal education funding, but there is no such obligation. The purpose of requiring the receipt of federal education funding in the Coverdell Act is to implicate Congress' spending power, which is broader than its legislative power. *Dydell v. Taylor*, 332 S.W.3d 848, 857 (Mo. 2011) (holding that the Coverdell Act is a constitutional exercise of Congress' spending power); *see also South Dakota v. Dole*, 483 U.S. 203 (1987) (holding that Congress may condition receipt of federal transportation funds on adoption of a 21-year old drinking age). This requirement has nothing to do with individual plaintiffs or individual teacher defendants, and, contrary to the Gambrills' assertions, no case has held to the contrary. *Doe v. Bd. of Educ. of Washington Cty.*, 2015 WL 4716065 (D. Md. Aug. 6, 2015) (holding that statutory preconditions under § 7946(a) are an affirmative defense, not receipt of federal funding); *Rodriguez v. Parker*, 2016 WL 4179799 (N.D. Tex. Apr. 27, 2016) (applying Coverdell immunity without defendants demonstrating receipt of federal funding); *Nkemakolam v. St. Johns Mil. Sch.*, 890 F. Supp. 2d 1260, 1263 (D. Kan. 2012) (same); *K.R. v. School Dist. of Phila.*, 2008 WL 2609810 (E.D. Pa. June 26, 2008) (same). Moreover, we would not, under any circumstances, remand this matter for the circuit court to decide that which is patently obvious (and, in the words of MD. R. 5-201(b) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"). MD. R. 5-201(b). Dorchester County Public Schools receive substantial federal ESEA education funding. *See* U.S. DEP'T. OF EDUC., TITLE I GRANTS TO LOCAL EDUCATION AGENCIES—MARYLAND (FY 2016), https://perma.cc/GFJ9-6XTW (reporting $2,121,875 in federal

8

With some exceptions not relevant here, the Coverdell Act provides:

> [N]o teacher in a school shall be liable for harm caused by an act or omission of the teacher on behalf of the school if—
>
> (1)    the teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity;
>
> (2)    the actions of the teacher were carried out in conformity with Federal, State, and local laws (including rules and regulations) in furtherance of efforts to control,

---

funds allocated to Dorchester County); MD. STATE DEP'T OF EDUC., SELECTED FINANCIAL DATA, MD. PUB. SCHOOLS (2016-2017), https://perma.cc/Z5M5-FWTP (reporting $2,014,420 in federal funds allocated to Dorchester County, and describing the minor discrepancy between the federally-reported and State-reported figures as "due to State-level adjustment"). Thus, we reject the Gambrills' argument that the Coverdell Act does not apply because there was no evidence that Dorchester County receives federal ESEA education funding.

We note that the U.S. District Court for the District of Maryland's opinion in *Doe v. Bd. of Educ. of Washington Cty.* has not been published in the federal reporter. In prior reported opinions, this Court has stated that "it is the policy of this Court in its opinions not to cite for persuasive value any unreported federal or state court opinion." *Kendall v. Howard Cty.*, 204 Md. App. 440, 445 (2012), *aff'd*, 431 Md. 590 (2013); *see also Poe v. IESI MD Corp.*, 243 Md. App. 243, 256 n.2 (2019); *Oliveira v. Sugarman*, 226 Md. App. 524, 553 (2016), *aff'd*, 451 Md. 208 (2017); *Margolis v. Sandy Spring Bank*, 221 Md. App. 703, 718 n.3 (2015). The Court of Appeals has not adopted a similar policy. *See, e.g.*, *Gables Constr., Inc. v. Red Coats, Inc.*, 468 Md. 632, 663 (2020) (agreeing with an unreported decision of the United States District Court for the District of Maryland); *Finci v. Am. Cas. Co. of Reading, Pa.*, 323 Md. 358, 375-76 (1991) (citing as support "recent unreported decisions" of federal district courts that "have rejected FDIC's public policy contention").

In approving this opinion for reporting, the Court of Special Appeals announces that it is no longer the Court's policy to prohibit the citation of unreported opinions of federal courts or the courts of other states for persuasive value, provided that the jurisdiction that issued any particular opinion would permit it to be cited for that purpose. That change does not apply to unreported opinions of this Court, which remain governed by Maryland Rule 1-104.

discipline, expel, or suspend a student or maintain order or control in the classroom or school;

    (3)    if appropriate or required, the teacher was properly licensed, certified, or authorized by the appropriate authorities for the activities or practice involved in the State in which the harm occurred, where the activities were or practice was undertaken within the scope of the teacher's responsibilities;

    (4)    the harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the teacher; and

    (5)    the harm was not caused by the teacher operating a motor vehicle …

20 U.S.C. § 7946(a). Finally, the Coverdell Act provides, "[t]his … preempts the laws of any State to the extent that such laws are inconsistent … except that this … shall not preempt any State law that provides additional protection from liability relating to teachers." 20 U.S.C. § 7945(a). Alternatively, a State may explicitly elect not to be governed by the teacher immunity provisions. 20 U.S.C. § 7945(b). Thus, a State has four choices: (1) reject federal ESEA education funding; (2) accept the federal ESEA funding and accept the Coverdell immunity; (3) accept the federal ESEA education funding and adopt its own teacher immunity statute "that provides additional protection from liability relating to teachers"; or (4) accept the federal ESEA funding and pass a law that explicitly refuses to adopt immunity.[7]

_____

[7] As the Supreme Court of Missouri described these choices,

We know that Maryland has not rejected the federal ESEA education funds, *see supra*, n.6, nor has it adopted a statute explicitly refusing to adopt Coverdell immunity under 20 U.S.C. § 7945(b).[8] The question, then, is whether Maryland has thereby elected Coverdell immunity or has adopted a "[s]tate law that provides additional protection from liability relating to teachers." 20 U.S.C. § 7945(a).

The relevant state law is Section 5-518 of the Courts & Judicial Proceedings Article. MD. CODE, CTS. & JUD. PROC. ("CJ") § 5-518. This statute requires local school boards to waive sovereign immunity for claims under $400,000. CJ § 5-518(b), (c). It also requires that the local school board be joined in any action against a county board employee. CJ § 5-518(d); *Neal v. Baltimore City Bd. of School Comm'rs*, 467 Md. 399, 404-06 (2020). Where a local county board employee is acting within the scope of employment, and without malice or gross negligence, they will not be personally liable. CJ § 5-518(e). Any judgment rendered against a local county board employee acting within the scope of employment and without gross negligence or malice shall be levied against the local county board only and may not be executed against the local county board employee. CJ

> This means that even were Missouri to reject the Act, there would be no loss of funding or other consequence—whether to make the provision of the Coverdell Act apply in Missouri is completely up to Missouri. There is no stick at all, only carrots. There is no coercion.

*Dydell*, 332 S.W.3d at 857.

[8] The requirements to adopt such a rejection are stringent. The State legislation must "(1) cit[e] the authority of this subsection; (2) declar[e] the election of such State that this subpart shall not apply, as of a date certain, to such civil action in the State; and (3) contain … no other provisions." 20 U.S.C. § 7945(b). There is no Maryland statute that satisfies these requirements.

§ 5-518(h).[9] This provides teachers in Dorchester County, and across Maryland, with a right of indemnification, but not immunity from suit. *Bd. of Educ. of Prince George's Cty. v. Marks-Sloan*, 428 Md. 1, 13 (2012) (holding that CJ § 5-518 provides indemnification).

We hold that, under the facts of this case, the teachers' right of indemnification under CJ § 5-518 offers them less protection than their right of immunity under the Coverdell Act.[10] *See*, *e.g.*, *Marks-Sloan*, 428 Md. at 27 (explaining that indemnification is a lesser protection than complete immunity from liability). An immunity provision provides broader protection because it acts as a bar to a lawsuit and the accompanying discovery process, whereas an indemnification provision allows a plaintiff to recover, and then shifts the financial burden away from the liable defendant. As a result, we hold that the federal Coverdell Act immunity applies and preempts the teachers' state statutory right to indemnification under CJ § 5-518.

Because there were no allegations that the individual teachers were not entitled to Coverdell Act immunity[11]—that is, the acts alleged were within the scope of the teachers' duties, were done according to governing law regarding student discipline, the teachers

---

[9] Other parts of CJ § 5-518 provide similar indemnification for local board members and volunteers.

[10] We need not decide now whether under the facts of a future case, it is possible that a teacher will not be immune under the federal Coverdell Act, but permitted the "additional protection" of indemnification under CJ § 5-518.

[11] Except, of course, for the suggestion that the teachers are not entitled to Coverdell Act immunity because of the Board's failure to plead and prove its receipt of federal ESEA education funding. That claim is rejected, *supra* at n.6.

were licensed, the acts were not willful or criminal misconduct, gross negligence,[12] reckless misconduct, or a conscious, flagrant indifference, and were not caused by a motor vehicle, 20 U.S.C. § 7946(a)—the circuit court did not err in granting summary judgment for the individual defendants: Bell, Collins, Woolford, Substitute 1, and Substitute 2.

## II. THE LOCAL BOARD OF EDUCATION CANNOT BE LIABLE FOR CLAIMS OF EDUCATIONAL NEGLIGENCE

As discussed in Section I, summary judgment was properly granted for the individual teachers under the immunity provision of the federal Coverdell Act. The Coverdell Act, however, does not provide immunity for the employers of teachers or for local school boards. As a result, after granting summary judgment to the individual teachers, the circuit court turned to consider the legal defenses to the Board's liability and, as reported above, found that "the negligent acts at issue here that are alleged were educational decisions and thus within the purview of *Hunter* and *Gurbani*."[13] The circuit court was correct in this determination.

---

[12] The Gambrills argue in their brief that the question of gross negligence is a jury question. The Gambrills, however, only pleaded a cause of action sounding in negligence, and nothing in the substance of their negligence count sounded in gross negligence.

[13] At that point in the proceedings, it is not clear what claims remained viable against the Board. As we noted above, the Gambrills had voluntarily dismissed Counts 1 and 3 of their complaint. The circuit court granted summary judgment for the Board as to Counts 2 and 4, and thus, at that instant, the circuit court was only deciding whether the Gambrills' claim against the Board in Count 5 was legally viable. Our review of Count 5 reveals that it is aimed directly at the individual teachers and not the Board, even in its capacity as the teachers' employer. The circuit court could have dismissed Count 5 on the basis that the complaint didn't state a claim against the Board upon which relief might have been granted, and we would certainly have affirmed it in so doing. It did not, however, base its decision on that ground. Instead, the circuit court rested its decision on its correct understanding that

13

It is well-established that "Maryland does not recognize a tort action seeking damages based on negligent education." *Tabor v. Baltimore City Pub. Schools*, 138 Md. App. 747, 751 (2001) (relying on *Hunter v. Bd. of Educ. of Montgomery Co.*, 292 Md. 481, 484 (1982)). Although *Hunter* and its progeny mostly consider academic decisions involving "improperly evaluating, placing [,] or teaching a student … [the] *Hunter* opinion is broadly written to embrace any claim of educational malpractice." *N.T. v. Baltimore City Bd. of School Comm'rs*, 2011 WL 3747751 at *8 (D. Md. Aug. 23, 2011).[14] Thus, we recently said that there is a "broad … body of case law that overwhelmingly favors judicial deference to academic decisions at all levels of education." *Gurbani v. Johns Hopkins Health Sys. Corp.*, 237 Md. App. 261, 293 (2018). The *Hunter* Court's rationale for refusing to recognize a tort for educational negligence was: (1) the lack of a workable rule of care against which the defendant's conduct could be measured; (2) the inherent uncertainty in computing damages; and (3) the burden on the school system. *Hunter*, 292 Md. at 484.

For the first time in their reply brief,[15] the Gambrills attempt to distinguish their claims from the *Hunter* line, arguing *first*, that student discipline is separate from

claims of educational negligence are barred as a matter of law in Maryland. Therefore, it is this decision that we review.

[14] *See supra*, n.6 (regarding citation of unreported opinions).

[15] The Gambrills' opening brief did not present any argument that the circuit court erred in granting summary judgment to the Board under *Hunter*. This constitutes waiver of the issue. *See* MD. R. 8-504 (a)(6); *DiPino*, 354 Md. at 56. For strategic reasons of its own, the Board, in its Appellee's brief, argued that the circuit court's decision that claims against the Board sounding in educational negligence were prohibited under the *Hunter* line of

14

education, and *second*, that their "damages here were caused by bodily injury and significant physical harm, not amorphous academic harm." (emphasis omitted). We are unpersuaded.

### A.  Student Discipline is an Essential Part of Education

*First*, the Gambrills argue that student discipline is not part of the educational system and therefore is not covered by the *Hunter* line of cases. As we will explain, we hold that student discipline is an essential component of educational policy, and that claims of negligent school discipline are prohibited as a matter of law under *Hunter*. In support of this holding, we note that Maryland state courts and the District Court for the District of Maryland have been consistent in applying this line of cases broadly to include all aspects of education. *See Gurbani*, 237 Md. App. at 293; *Tabor*, 138 Md. App. at 751; *NT*, 2011 WL 3747751 at *8. Our research has not disclosed a single exception to this rule.[16]

More importantly, we think it is obvious that the manner in which students are disciplined has important educational consequences for both the students being disciplined and their classmates. This was true under the former disciplinary model that was used in

---

cases. In their reply brief, the Gambrills, for the first time, argued that the circuit court erred in this regard. Ordinarily, we will not consider an issue raised for the first time in a reply brief. *Gazunis v. Foster*, 400 Md. 541, 554 (2007) (quoting *Jones v. State*, 379 Md. 704, 713 (2004)). Here, however, because the Board first brought the issue to our attention, it cannot complain of surprise or a lack of opportunity to respond (although clearly in the reverse of the ordinary order of argument). As a result, we exercise our discretion to address this legal issue. *Id.*

[16] Of course, in a case in which a teacher physically assaults a student, that will fall outside of the teacher's scope of employment. In such a case, the teacher will be personally liable. *See Tall v. Bd. of School Comm'rs of Baltimore City*, 120 Md. App. 236 (1998).

Maryland, known as the "exclusionary model" whereby students who caused disciplinary problems were excluded from the classroom—by expulsion, suspension, or just temporary removal to the principal's office—so that the teacher and the remaining students could focus on their lessons. *See*, *e.g.*, MARYLAND ADVISORY COMMITTEE TO THE U.S. COMMISSION ON CIVIL RIGHTS, *Disparities in School Discipline in Maryland*, (October 2019) https://perma.cc/8HFM-WWMA (explaining disciplinary methods focused on removal from the learning environment). It is even more true as Maryland is moving toward a new restorative model of student discipline.[17] This new approach is intended to disrupt

---

[17] The process by which Maryland's public schools generally, and Dorchester County Public Schools specifically, have moved from the exclusionary model to the restorative model is clear. In 2017, the Maryland General Assembly established the Maryland Commission on the School-to-Prison Pipeline and Restorative Practice to study disciplinary procedures in schools. Acts of Md. 2017 ch. 762. In 2018, the Commission reported that exclusionary and punitive disciplinary practices fail to reduce misbehavior, do not make schools safer, and have the effect of pushing students out of schools and into the criminal justice system. The Commission put forth a series of recommendations on how to best implement a restorative approach to student discipline. MARYLAND COMMISSION ON THE SCHOOL-TO-PRISON PIPELINE AND RESTORATIVE PRACTICE, Final Report and Collaborative Action Plan (December 20, 2018), https://perma.cc/67MR-JZLQ. In 2019, the General Assembly accepted the Commission's recommendations and passed a bill to mandate that schools adopt a restorative approach to student discipline. H.B. 725 (2019). This change in the law is now codified at MD. CODE, EDUC. ("ED") § 7-306 *et seq.*, which directs the State Board of Education to establish guidelines that define a State code of restorative discipline for all public schools with standards of conduct and consequences for violations of the standards. It also provides that the 24 local school boards must adopt restorative based regulations to create and maintain the atmosphere of order and discipline necessary for effective learning. *See* COMAR 13A.08.01.11. Those regulations set forth a general restorative disciplinary philosophy for schools in the State. COMAR 13A.08.01.11A (local school boards shall adopt policies "with the goal of maintaining an environment of order, safety, and discipline necessary for effective learning"). The regulations also direct local county school boards to adopt policies consistent with the restorative philosophy. Moreover, the regulations emphasize "discretion in imposing [student] discipline." COMAR 13A.08.01.11A(4). In response, Dorchester County adopted

16

the so-called school-to-prison pipeline, by which students who are excluded from the learning environment because of misbehavior often move directly into the juvenile or criminal justice systems. The restorative model of student discipline does this by viewing discipline as more of a learning tool, and less of a punishment. The restorative approach is

> a student discipline model that … is preventative and proactive … emphasizes building strong relationships and setting clear behavior expectations that contribute to the well-being of the school community … focuses on accountability for any harm done by problem behavior; and … addresses ways to repair the relationships affected by the problem behavior with the voluntary participation of an individual who was harmed.

MD. CODE, EDUC. ("ED") § 7-306(a)(1).

The governing law now requires restorative disciplinary approaches, which include, but are not limited to conflict resolution, mediation, peer mediation, restorative conferences, social emotional learning, trauma-informed care, positive behavioral interventions, and rehabilitation. ED § 7-306(a)(2). Traditional exclusionary punishments like in-school suspension, out of school suspension, and expulsion are permitted where appropriate, but "the primary purpose of any disciplinary measure is "rehabilitative,

---

a student handbook based on the State's adoption of the restorative model of student discipline. *See* DORCHESTER COUNTY PUBLIC SCHOOLS, CODE OF CONDUCT HANDBOOK AND GRADING, PROMOTION, AND RETENTION SYSTEMS PROCEDURE, (revised July 2019), https://perma.cc/PL2N-QX7E. The Dorchester County Student Code of Conduct includes a carefully constructed matrix of behavior-related offenses and a range of appropriate consequences given the severity and reoccurrence of the behavior. *Id.* at 3-9. Although exclusionary punishments like suspension and expulsion remain possible consequences for the most severe or repeated infractions, the lesser, non-exclusionary consequences, including those in ED § 7-306(a)(2), as described above, will, in many cases, be the appropriate disciplinary response under this new Code of Student Conduct.

restorative, and educational." ED § 7-306(d)(1). Critically, educational experts who advocate for the adoption of the restorative model don't consider discipline to be separate from the program of academic instruction, but as a vital component of the educational program. *See*, *e.g.*, K. Brooke Stafford-Brizard, *Nonacademic Skills Are the Necessary Foundation for Learning*, EDUCATION WEEK (July 22, 2016) ("A growing body of research, drawn from the science of child development, demonstrates the extent of the impact that nonacademic and social-emotional skills—such as self-regulation, problem-solving, social awareness, and growth mindset—have on academic outcomes and success in the workforce and in life."), https://perma.cc/7YNN-PPKW; Derek Black, *Reforming School Discipline*, 111 Nw. U. L. REV. 1 (2016) (explaining why exclusionary discipline negatively affects misbehaving students, and their non-misbehaving counterparts); Gary Ritter, *Reviewing the Progress of School Discipline Reform*, 93 PEABODY J. EDUC.133 (2018) (reviewing the literature that has concluded that exclusionary discipline is disproportionately imposed on Black students, and is associated with negative effects on academic achievement, school drop-out rate, grade retention, and involvement in the juvenile or criminal justice system); *see also* Jenni Owen, Jane Wettach, & Katie Claire Hoffman, *Instead of Suspension: Alternative Strategies for Effective School Discipline*, DUKE CENTER FOR CHILD AND FAMILY POLICY AND DUKE LAW SCHOOL (2015), https://perma.cc/76F9-NPQX; Al Passarella, *Restorative Practices in Schools*, JOHNS HOPKINS SCHOOL OF EDUCATION INSTITUTE FOR EDUCATION POLICY (May 2017), https://perma.cc/W82M-V7ZA. We are persuaded that student discipline is a vital and

integral part of our educational system and must necessarily be covered by the *Hunter* line of cases.

This view is reinforced by our review of the Gambrills' complaint. Although their complaint is not crystal clear, the Gambrills' claims are either that the discipline that S. received was too harsh, that the discipline her tormentors received was not harsh enough, that the Board failed to teach the teachers how to follow the discipline matrix, *see supra*, n.16, or that the discipline matrix was erroneously constructed. All of these claims sound in educational negligence.[18]

We, therefore, decline to follow the Gambrills' suggestion that we treat student discipline as something different from academic negligence, or outside of the *Hunter* line of cases.

### B.      *S.'s Physical Injuries do not Bring this Case out of the* <u>Hunter</u> *Line*

*Second*, the Gambrills theorize that because S.'s injuries were physical, rather than academic, this case should not be covered by the *Hunter* line of cases. We do not diminish the severity or seriousness of S.'s injuries. They are certainly upsetting. It must be horrifying to have a child return from school covered in bruises and welts. Nevertheless, as this Court said in *Alban v. Bd. of Educ. of Harford Cty.*:

> The appellants have attempted to distinguish the present situation from those in *Hunter* and *Doe* [*v. Bd. of Educ. of Montgomery Cty.*, 295 Md. 67 (1982)][19] by arguing that the injury complained of in this case was a physical one, whereas

---

[18] Complaints regarding school discipline, although not cognizable in the tort system, may still be addressed administratively. *See* ED §§ 4-205, 7-305.

[19] *Doe* is another case in the *Hunter* line of cases.

> psychological injuries were complained of in the other two cases. It is a distinction without a difference.

64 Md. App. 169, 174 (1985). We are bound to that holding and could not change it, even if we wanted to. As explained, the circuit court's finding that the Gambrills' claim against the Board in Count 5 was precluded by the *Hunter* line of cases was correct, and the same three obstacles that the *Hunter* Court identified would also apply here: there is a lack of a workable rule of care against which a defendant's conduct or the adequacy of disciplinary procedures could be measured; there is inherent uncertainty in computing damages; and the entire exercise would place unwarranted burden on the already overburdened resources of our schools, and the judiciary. *Hunter*, 292 Md. at 484.

## CONCLUSION

As reported above, the circuit court granted summary judgment for the individual defendants due to the immunity provided by the federal Coverdell Act. It granted summary judgment to the Board because Maryland law does not recognize a cause of action in tort for educational negligence. We affirm these holdings. As a result, we need not consider the third basis for the circuit court's summary judgment, that no reasonable juror would have found any of the defendants liable.

**JUDGMENT OF THE CIRCUIT COURT FOR DORCHESTER COUNTY IS AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**